NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10725

COMMONWEALTH  vs.  RYAN BOIS.


Norfolk.     January 12, 2016. - November 10, 2016.

Present:  Gants, C.J., Spina, Cordy, Duffly, & Lenk, JJ.[1]


Homicide.  Rape.  Armed Home Invasion.  Felony-Murder Rule.
    Insanity.  Jury and Jurors.  Practice, Criminal, Capital
    case, Assistance of counsel, Jury and jurors, Conduct of
    juror, Instructions to jury, Argument by prosecutor.


Indictments found and returned in the Superior Court
Department on August 30, 2007.

The cases were tried before Janet L. Sanders, J., and a
motion for a new trial, filed on October 12, 2012, was heard by
her.


Dennis Shedd for the defendant.
Tracey A. Cusick, Assistant District Attorney, for the
Commonwealth.


LENK, J.  In 2009, a Superior Court jury convicted the

defendant of murder in the first degree on theories of extreme

atrocity or cruelty and felony-murder.  The jury found that, on

_____

[1] Justices Spina, Cordy, and Duffly participated in the
deliberation on this case prior to their retirements.

August 4, 2007, the defendant broke into his grandmother's house and then raped and strangled his six-year-old cousin, who was staying there for the night.  The defendant was convicted also of nine other charges, including home invasion while armed with a dangerous weapon, G. L. c. 265, § 18C.[2]  At trial, the defendant conceded that he had killed the victim, but argued that he was not guilty by reason of insanity.  On appeal from his convictions and from the denial of his motion for a new trial, the defendant asserts that (a) trial counsel was ineffective for failing to present certain evidence relevant to his insanity defense and to object to the jury charge on the insanity defense; (b) the judge did not respond adequately to reports that a juror slept through certain portions of the trial; (c) the evidence was insufficient on an element of the home invasion charge, and the judge incorrectly instructed the jury on that element; (d) the instructions on felony-murder impermissibly removed from the jury's consideration one of its elements; and (e) the prosecutor's closing argument was improper.  The defendant asks also that, pursuant to G. L. c. 278, § 33E, we reduce the murder conviction to murder in the

---

[2] These included two counts of forcible rape of a child, G. L. c. 265, § 22A, as well as one count each of kidnapping, G. L. c. 265, § 26; larceny under $250, G. L. c. 266, § 30 (lesser included offense); larceny of a motor vehicle, G. L. c. 266, § 28 (a); malicious destruction of property, G. L. c. 266, § 127; reckless driving, G. L. c. 90, § 24 (2) (a); and failure to stop for a police officer, G. L. c. 90, § 25.

second degree as more consonant with justice, because his actions were the product of mental illness.

We affirm the conviction of murder in the first degree, and decline to exercise our power under G. L. c. 278, § 33E, to reduce the degree of guilt or to order a new trial. With respect to the charge of home invasion, we agree with the defendant that the evidence was insufficient, and that his conviction must be reversed. We affirm the other convictions.

1. Background. a. Facts. We recite the facts the jury could have found, reserving certain details for later discussion. In 2007, when the defendant was twenty years old, he did not have a permanent residence and stayed with various friends and family members. At one point during the year, he lived with his grandmother in Weymouth for approximately one month. After moving out, he asked his grandmother for money to pay his rent. She agreed, but insisted on driving the defendant to meet his landlord and to obtain a receipt. When they arrived, the grandmother handed the defendant the money, and he ran off. Several weeks later, on the morning of August 4, 2007, the defendant called his grandmother, asking if he could come to her house. She refused.

At 2 or 3 P.M. that day, the defendant attended a cookout at the home of his friend, Megan Phinney, staying there until late in the evening. At "10 or 10:30" P.M., at the defendant's

request, one his friends drove him from the cookout to his grandmother's house, approximately one mile away. The victim, the defendant's six year old cousin, and her four year old brother were staying with his grandmother that night.[3] All three had gone to sleep by the time the defendant arrived.

After being dropped off, the defendant climbed on top of his grandmother's white Ford Explorer vehicle, which was parked in the driveway in front of the house, below a front-facing second-floor window. He used a "folding" knife with a three-inch blade to cut a hole in the window screen, and entered. Somewhere inside, he encountered the victim. He raped and strangled her in a front bedroom, then wrapped her body in bedding taken from that bedroom. He took cash from his grandmother's purse, as well as her cellular telephone and the keys to the Explorer. He left the house carrying the victim's body, which he placed on the floor of the Explorer between the front and rear seats, and drove off.

At 10:57 P.M., the defendant appeared on a surveillance video recording entering a convenience store approximately one mile from his grandmother's house. He left the store without purchasing anything.

---

[3] The children slept in a bedroom in the back of the house, while the grandmother slept on a porch separated from the bedroom by a sliding glass door.

Sometime after midnight, on August 5, 2007, the defendant used his grandmother's cellular telephone to call one of his acquaintances, Terrence Gandy. He told Gandy that he "had some money to burn" and "wanted to get some drugs." He drove to Gandy's house in the Dorchester section of Boston, bought marijuana, and smoked it with Gandy. He told Gandy that the Explorer he was driving "was stolen," and asked him, "If I ever killed anybody, what would I do with the body to get rid of it[?]" Gandy replied that he should "chop it up." The defendant left after "fifteen to [twenty] minutes."

At approximately 1:15 A.M., a Weymouth police officer in the canine unit stopped the Explorer for speeding. When the officer approached the vehicle, however, it sped off, and the officer pursued it. During the chase, both vehicles reached speeds of one hundred miles per hour. The Explorer ultimately crashed into a taxicab while attempting to turn at an intersection. The defendant got out of the vehicle and ran away. When the defendant disregarded the officer's warning to stop, the officer released his police dog. The dog chased and subdued the defendant. As the officer approached the defendant, who was lying face down on the ground with his arms outstretched, as instructed, the defendant turned to the officer and started yelling, "Just shoot me in the face. Kill me now.

You don't know what I did.  Just kill me now.  Shoot me in the fucking face."

The officer turned around to signal other officers who had arrived at the scene.  When he turned his attention back to the defendant, he saw that the defendant had tucked his hands underneath his body.  The defendant was holding a folding knife with a three-inch blade, and was pleading with the officer "to shoot him, kill him."  The defendant eventually released the knife and was arrested.[4]  He continued "ranting and raving" until he was placed in a police cruiser.

After the defendant's arrest, officers conducted an inventory search of the Explorer, which they intended to have towed.  They discovered the victim's body, naked from the waist down, wrapped in the grandmother's bedding.  Her shorts and underwear were nearby.  Police contacted the grandmother, who was unaware that the defendant had been in her house, that her Explorer had been stolen, or that the victim was missing.  During a search of the grandmother's house, police found that the bedsheets were missing from the front bedroom.  They also found traces of blood and seminal fluid in that room, and bloody pillows in the victim's bedroom.

---

[4] Police recovered a knife and a small bag containing what was later determined to be cocaine.

b. Trial proceedings. On August 30, 2007, the defendant was indicted on charges of murder in the first degree and twelve other offenses.[5] At trial in March, 2009, the Commonwealth proceeded on the murder charge on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder. To establish that the defendant was criminally responsible for his actions, the Commonwealth presented testimony regarding his behavior on the day of the killing. The defendant's girl friend testified that she spoke with him around noon that day, and agreed that he did not "sound any different" than usual. A friend who had been at the cookout recalled that the defendant drank beer, played horseshoes, and agreed that he did not "appear[] different . . . than what [his friends] had known him to be like in the past."

The Commonwealth also presented expert testimony regarding fingerprints, blood, and seminal fluid that were recovered from the grandmother's house and the victim's body. One expert testified that samples of deoxyribonucleic acid (DNA) recovered from sperm cells on the victim's body matched the defendant's

_____

[5] The other indictments included two counts of forcible rape of a child, and one count each of home invasion; kidnapping; assault with a dangerous weapon, G. L. c. 265, § 15B (b); possession of cocaine, G. L. c. 94C, § 34; larceny over $250; larceny of a motor vehicle; malicious destruction of property; reckless driving; operating a motor vehicle with a suspended license, G. L. c. 90, § 23; and failure to stop for a police officer.

DNA profile, and another testified that a palm print on the front window matched that of the defendant.

The defendant conceded that he had raped and killed the victim, but contended that he was not guilty by reason of insanity. The defendant did not, however, offer expert testimony regarding specific mental illnesses from which he suffered, and did not present any medical or treatment records. Nor did he offer an expert opinion that he lacked criminal responsibility for his actions. Rather, he relied on testimony concerning his behavior immediately following the killing, as well the nature of the crime itself, to establish his mental state.[6] He also presented testimony from his grandmother, on cross-examination, that he had been admitted to psychiatric hospitals numerous times during his adolescence, that he had been prescribed medications for psychiatric disorders, and that, because of behavioral issues, he had been placed in the custody of the Department of Youth Services (DYS).[7]

In addition, the defendant introduced expert testimony from a forensic psychologist who had not examined him, concerning the

_____

[6] The defendant's acquaintance Terrence Gandy, for instance, testified that the defendant "didn't seem like he was himself," that "he was a little more hyper" than usual, and that "he just didn't seem like he was in his right mind." The arresting officer testified that the defendant was "ranting and raving."

[7] On direct examination by the Commonwealth, the grandmother agreed that she never "bec[a]me aware of [the defendant] having any type of a mental illness."

general standards used to evaluate a defendant for lack of criminal responsibility, and the general characteristics of a number of mental illnesses. The expert agreed that someone may "be in the throes of mental illness and appear normal to lay observers," and testified that a person "would be admitted to [a] psychiatric facility only [if] someone . . . as part of the admission . . . believed that they had symptoms of a mental illness." The expert did not present any opinion regarding the defendant's mental state or behavior.

The jury convicted the defendant of murder in the first degree on theories of extreme atrocity or cruelty and felony-murder,[8] but not on the theory of deliberate premeditation.[9]

c. <u>Motion for a new trial</u>. In October, 2012, the defendant filed a motion for a new trial pursuant to Mass. R. Crim. P. 30, as appearing in 435 Mass. 1501 (2001). He argued, among other things, that his trial counsel was ineffective for failing to review and present to the jury records of psychiatric

---

[8] The predicate felonies for the conviction of felony-murder were rape of a child by force and home invasion.

[9] The jury also convicted the defendant of eight of the other offenses charged, including two counts of rape, home invasion, kidnapping, larceny of a motor vehicle, malicious destruction of property, reckless driving, failing to stop for a police officer. In addition, he was convicted of the lesser included offense of larceny under $250. The jury acquitted him of possession of cocaine and operating a motor vehicle with a suspended license. The judge entered a directed verdict on the indictment charging assault by means of a dangerous weapon.

treatment he had received as an adolescent. Those records, he maintained, indicated that the defendant had suffered sexual abuse as a child, and that he had been diagnosed with several mental illnesses. He argued also that trial counsel had failed to present evidence of certain strange behavior he exhibited on the day of the killing. After a nonevidentiary hearing, the motion was denied by the Superior Court judge who had been the trial judge.

4. Discussion. On appeal, the defendant contends that (a) trial counsel was ineffective in her presentation of the insanity defense, (b) the judge did not respond adequately to reports of a sleeping juror, (c) there was insufficient evidence on the home invasion charge and the jury were incorrectly instructed on that issue, (d) the judge's instruction removed an element of the felony-murder charge from the jury's consideration, and (e) the prosecutor made certain inappropriate remarks during closing argument. He claims also that we should reduce the degree of guilt pursuant to our authority under G. L. c. 278, § 33E.

a. Claim of ineffective assistance of counsel. As he did in his motion for a new trial, the defendant argues that counsel's investigation and presentation of his insanity defense was constitutionally deficient. He claimed, in particular, that "counsel failed to adequately investigate [his] history of

treatment for mental illnesses"; "failed to present evidence of his unusual behavior shortly before the . . . crime"; and "failed to object to erroneous instructions on the mental health defense[]."

"Because the defendant has been convicted of murder in the first degree, we consider [his] contention of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice . . . , which is more favorable to a defendant than the constitutional standard for determining whether there has been ineffective assistance. Thus, we consider whether there was error during the course of the trial, and, if so, whether the error was 'likely to have influenced the jury's conclusion'" (citation omitted). Commonwealth v. Williams, 453 Mass. 203, 204-205 (2009). "Under this more favorable standard of review, we consider a defendant's claim even if the action by trial counsel does not 'constitute conduct falling "measurably below" that of an "ordinary fallible lawyer."' . . . A strategic decision by an attorney, however, amounts to ineffective assistance 'only if it was manifestly unreasonable when made'" (citations omitted). Commonwealth v. Pena, 455 Mass. 1, 22 (2009).

i. Treatment records. The defendant maintains that defense counsel erred in failing to read, or to introduce at trial, treatment records from his psychiatric hospitalizations

and from his commitments to DYS facilities. These records indicate that the defendant suffered sexual abuse as a child, and that, during his adolescence, he was diagnosed with several mental illnesses, including agitated depression, bipolar disorder, and posttraumatic stress disorder. The records span a period of twelve years, from 1992, when the defendant was five years old, to 2004, shortly before his eighteenth birthday. The defendant contends that, had evidence of these specific diagnoses been presented to the jury, the insanity defense might have been successful.

In an affidavit submitted in conjunction with the defendant's motion, trial counsel explained that she was aware of the treatment records, and had seen them mentioned in the defendant's competency evaluation prepared by a forensic psychologist at Bridgewater State Hospital. She stated further that, although she herself did not review the records, she had obtained funds to hire an expert psychologist to review the documents. Having reviewed the records, and having asked a colleague to do the same, the expert informed counsel that he was unable to offer an opinion that, at the time of the offense, the defendant had not been criminally responsible. Counsel averred that she therefore decided not to present expert testimony on the basis of the defendant's medical records. She did not, however, explain why she chose not to introduce the

treatment records themselves, unaccompanied by expert testimony. See Commonwealth v. Dung Van Tran, 463 Mass. 8, 20 (2012) ("defendant with prior history of mental disorders and treatment 'may offer evidence of the same through medical records with or without expert witnesses'" [citation omitted]).

While unexplained in the affidavit, counsel's decision not to introduce the records appears to have been strategic. See Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015) (where ineffective assistance claim is based on tactical or strategic decision by counsel, defendant may show counsel was ineffective only if decision was "manifestly unreasonable" when made). At a pretrial hearing, counsel argued successfully, against the Commonwealth's opposition, that the Commonwealth was not entitled to review the defendant's mental health records, because she was neither presenting them at trial nor seeking to introduce expert testimony based on their content. Moreover, during voir dire of the venire, she asked each prospective juror, "If there is no evidence presented regarding hospitalization or a diagnosis, would you still be able to keep an open mind about an insanity defense?" It therefore seems that, after due consideration, counsel deliberately decided not to present documentary evidence of the defendant's mental illnesses. "[S]trategic choices made after thorough investigation of [the] law and facts . . . are virtually

unchallengeable."  Commonwealth v. McMahon, 443 Mass. 409, 425 (2005), quoting Strickland v. Washington, 466 U.S. 668, 690 (1984).

The defendant contends, however, that without having read the records herself, counsel could not have conducted a "thorough investigation," Commonwealth v. McMahon, supra, and was not in a position to make the strategic decision to keep the records from the jury's consideration.  See Commonwealth v. Baker, 440 Mass. 519, 529 (2003) ("Until [counsel] commenced . . . an investigation, he simply had no way of making a reasonable tactical judgment").

We do not agree.  Although it would have been preferable for counsel personally to review the treatment records, she did not fail to consider them, or to make an investigation of their contents.  Indeed, she reviewed the competency report prepared by the forensic psychologist at Bridgewater, which summarized most of the relevant records, and which described the defendant's treatment history and diagnoses.  Contrast Commonwealth v. Lang, 473 Mass. 1, 11 (2015) (Hines, J., concurring) ("defendant's trial counsel did not review the defendant's psychiatric history").  Counsel also retained two experts, both of whom reviewed the records and opined that they did not support the conclusion that the defendant lacked criminal responsibility at the time of the crime.  Contrast

Commonwealth v. Alvarez, 433 Mass. 93, 101 (2000) ("Counsel's failure to review or provide to the defense expert [relevant] medical records . . . fell measurably below that of an ordinary fallible lawyer" [emphasis supplied]).  In light of counsel's knowledge of the substance of the records, and given that the experts she retained could not endorse an insanity defense after reading them, counsel's investigation was sufficient to allow her to make the strategic decision not to present the records to the jury.  This decision was not "manifestly unreasonable."

Moreover, it is unlikely that the exclusion of the records resulted in any prejudice to the defendant.  See Commonwealth v. Williams, 453 Mass. at 204-205.  As the judge noted in her decision on the defendant's motion for a new trial, although the records contained sympathetic information, such as the defendant's history of abuse and mental illness, and while they would have prevented the prosecutor from arguing that the defendant's hospitalizations were not the result of a diagnosable disease, they also contained information that would have painted the defendant in a negative light.  For example, the records indicated that the defendant had a criminal record[10] and was a member of a gang, and stated also that he "attempt[ed]

---

[10] They indicate, for instance, that the defendant was adjudicated delinquent for, among other things, committing assault by means of a dangerous weapon and malicious destruction of property over $250.

to manipulate situations by avoiding responsibility for his behavior" and "display[ed] little remorse for his [violent] actions."[11]

In addition, the records contained information that might have undercut the insanity defense. The most recent of the records, from three years before the crime, indicated that the defendant was "doing well," that he was employed and had a girl friend, and that he "recently discontinued his medication [(impliedly with medical approval)]."[12] Had these records been presented to the jury, the prosecutor likely would have used them to support the argument that the defendant was capable of rational, calculated thought, and that the killing was the result of such thought, rather than of mental illness.

In sum, counsel's decision not to introduce the defendant's treatment records was not manifestly unreasonable, and did not result in prejudice to the defendant.

---

[11] Counsel was aware from the competency evaluation that the records described the defendant's history of delinquent and criminal behavior, and contained other potentially damaging information.

[12] The defendant contends that some of these details, if not relevant to his diagnosis and treatment, could have been redacted. See Commonwealth v. Irene, 462 Mass. 600, 616, cert. denied, 133 S. Ct. 487 (2012) (medical records admissible as business records only to extent they are "germane to the defendant's treatment or medical history"). On their face, however, the records suggest that many of these details were, in fact, relevant to the defendant's psychiatric treatment -- focused, as it was, on his behavioral issues -- and thus unlikely to have been subject to redaction.

ii.  Defendant's behavior earlier on day of killing.  In August, 2007, a State trooper interviewed Cynthia Phinney, the mother of the defendant's friend who had hosted the cookout that the defendant attended on the day of the killing.  Phinney reported seeing the defendant at the cookout, and told the trooper that he was "in a funny mood . . . he was sad."  She added that

> "at one point [the defendant] took a shower in the house. . . . [A]fter [he] took a shower, he remained in her laundry room for about ten minutes. . . . [S]he walked into the laundry room and found [him] just standing there naked."

The defendant contends that trial counsel was ineffective for not calling Phinney to testify about this incident, as it would have suggested that the defendant exhibited "behavior . . . consistent with that of a person suffering from bipolar disorder."[13]

The record does not indicate whether counsel considered calling Phinney.  We are persuaded, however, that, overall, Phinney's testimony was not "likely to have influenced the jury's conclusion" [citation omitted].  See Commonwealth v. Williams, 453 Mass. at 206.  Before describing the defendant's mood and behavior, Phinney told the trooper that the defendant "showed up with a thirty-pack of beer," that he became

---

[13] The defendant's expert described to the jury the expected symptoms of bipolar disorder.

"trashed . . . and [that he] needed to sober up."  Thus, it is likely that the jury would have attributed his mood to consumption of alcohol, rather than as a symptom of mental illness.  In addition, Phinney testified before the grand jury that, earlier that afternoon, the defendant "was fine.  He's always happy-go-lucky, always singing, dancing, and always just a happy kid."  Had Phinney testified, such statements could have undermined any testimony that the defendant was "sad" or in a "funny mood."  Given the potentially harmful impact of Phinney's statements on the defendant's insanity defense, no prejudice to him resulted from counsel's decision not to call her to testify.

iii.  Jury instructions.  The defendant argues that counsel was ineffective for failing to object to two specific jury instructions.

A.  Instruction on insanity.  In instructing the jury on the insanity defense, the judge stated:

> "To summarize then, if the Commonwealth fails to prove beyond a reasonable doubt that the defendant possessed the substantial capacity to appreciate the criminality or wrongfulness of his conduct, and also that the defendant possessed a substantial capacity to conform his conduct to the requirements of the law, you must return a verdict of not guilty by reason of insanity" (emphasis supplied).

The defendant contends that this instruction was erroneous, because it implies, in his view, that a verdict of not guilty by reason of insanity was required only if the Commonwealth failed to prove both that the defendant "possessed the substantial

capacity to appreciate the wrongfulness of his conduct," and that he "possessed a substantial capacity to conform his conduct to the requirements of the law." If, however, the Commonwealth were able to prove only one of these two prongs, the defendant argues, this instruction implied incorrectly that the jury should return a guilty verdict. As the defendant asserts, the Commonwealth must prove both a defendant's ability to understand the wrongfulness of his conduct and his capacity to conform his conduct to the law; failure to prove either prong requires a verdict of not guilty by reason of insanity. See Model Jury Instructions on Homicide 51-52 (1999).

Trial counsel did not object to the instruction as given. The defendant claims that counsel's failure to object constituted ineffective assistance. This claim is unavailing. While the language at issue might, in isolation, be understood in the manner the defendant suggests, a more natural interpretation is that a verdict of not guilty by reason of insanity was required if the Commonwealth failed to prove either one of the prongs, by failing to show both that "the defendant possessed the substantial capacity to appreciate the criminality or wrongfulness of his conduct, and that the defendant possessed a substantial capacity to conform his conduct to the requirements of the law." We are persuaded that the jury understood the instruction in this way, since, as the defendant

concedes, the judge explained the standard correctly, clearly, and without ambiguity earlier in her instructions.[14]  See Commonwealth v. Young, 461 Mass. 198, 207 (2012) ("When reviewing jury instructions, '[w]e evaluate the instruction as a whole, looking for the interpretation a reasonable juror would place on the judge's words.' . . .  We do not consider bits and pieces of the instruction in isolation" [citations omitted]).

B.  Instruction on diminished capacity.  The judge instructed the jury that they could convict the defendant of murder in the first degree on a theory of extreme atrocity or cruelty if they found that the defendant had so-called "third-prong malice," i.e., "intent to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow."  The defendant argues that the judge erred in not instructing the jury that, in determining whether the defendant had such an intent, "they should consider the extent of the defendant's knowledge of the circumstances at the time of the killing and, in that regard, they should consider the evidence of his mental impairment."  See Commonwealth v. Delaney, 418

_____

[14] For example, the judge stated that a "person is not criminally responsible for his conduct if he suffers from a mental disease or defect, and as a result of that mental disease or defect lacks a substantial capacity either to appreciate the criminality of wrongfulness of his conduct or to conform his conduct to the requirements of the law" (emphasis supplied).

Mass. 658, 663-64 (1994). The defendant maintains also that counsel was ineffective for failing to object to the absence of this language. The instructions as a whole, however, do not support this claim. Shortly after giving the now-challenged instruction, the judge explicitly told the jury that they must consider the defendant's mental state in determining the extent of the defendant's knowledge.[15]

b. Report of sleeping juror. Before the jury charge, a juror reported that another juror had been sleeping during closing arguments. The judge conducted a hearing on what should be done in response to the juror's assertion. Defense counsel stated, "I think we [should] leave it alone. I didn't notice it, and I think we were both looking at the jurors during our closing argument." She added, "I'm more concerned about [the reporting] juror than I am the juror who may have been falling asleep. It sounds like that juror has an agenda of some type." The prosecutor also said that he had not noticed the juror had

---

[15] The judge instructed:

"In determining whether the Commonwealth has proved this third meaning of malice, you must consider the defendant's actual knowledge of the circumstances at the time that he acted.

"Again, in determining whether the Commonwealth has proved that the defendant had the intent required to constitute malice in any one of these ways, you may consider any evidence regarding the defendant's mental condition at the time of the alleged events."

been sleeping, and suggested that no action was required in response to the report.

The following day, a juror who had been designated as an alternate[16] sent the judge a note stating that he had observed the same juror "f[a]ll asleep during trial on several occasion's [sic]." Defense counsel responded,

> "I just wanted to say that I watched this particular juror yesterday during Your Honor's very lengthy . . . charge . . . because it was brought to our attention that this particular juror had been falling asleep. . . . What I noted is that she occasionally closed her eyes, but would move her hands and turn her head and open her eyes. I was confident yesterday in observing her during Your Honor's charge that she was not sleeping."

As requested, the judge took no further action. The defendant now argues that the judge erred in taking no action, and should, at a minimum, have conducted a voir dire of the juror in question. See Commonwealth v. Dyous, 79 Mass. App. Ct. 508, 512-514 (2011) (judgment reversed because of sleeping juror although defendant's trial attorney urged judge to take no action).

The defendant's argument is not persuasive. "[N]ot every complaint regarding juror attentiveness requires a voir dire. . . . Rather, if a judge receives a complaint or other information suggesting that a juror was asleep or otherwise

---

[16] It is not clear if the juror making this report was the same one who had reported suspicions of a sleeping juror the previous day.

inattentive, the judge must first determine whether that information is 'reliable.' . . . In making this determination, the judge must consider the nature and source of the information presented, as well as any relevant facts that the judge has observed from the bench. . . . The burden is on the defendant to show that the judge's response to information about a sleeping juror was 'arbitrary or unreasonable'" (quotations and citations omitted). Commonwealth v. McGhee, 470 Mass. 638, 644 (2015).

Here, the defendant has not met this burden. On both occasions, the judge immediately conducted a hearing on the juror's report. At those hearings, both defense counsel and the prosecutor stated that they had not noticed that the juror was asleep, and defense counsel provided specific information to explain both the basis of the report (the juror had closed her eyes) and why there was ultimately no cause for concern (the juror was actually awake). In light of this, there was no error in the judge's decision that the report of a sleeping juror was not "reliable," id., and that no further action was required.

c. Armed home invasion. In instructing the jury on the elements of home invasion, the judge stated that the Commonwealth must prove "that the defendant at the time of the entry was armed with a dangerous weapon[.]" See G. L. c. 265, § 18C. She then instructed that, as a matter of law, "[k]nives

are inherently dangerous." The defendant contends that this was error, and that the jury should have been instructed to determine whether the knife he had in his possession was dangerous as used. He contends also that, even if a correct instruction were given, there was insufficient evidence that the knife was dangerous as used, and that a directed verdict on this charge should have entered. We agree.

Conviction under the home invasion statute requires the Commonwealth to prove the defendant entered the dwelling "while armed with a dangerous weapon" and "use[d] force or threaten[ed] the imminent use of force upon any person within such dwelling[.]" See G. L. c. 265, § 18C. The "phrase 'dangerous weapon' has a defined meaning under the common law that is routinely applied to those statutory crimes that have a dangerous weapon element." Commonwealth v. Wynton W., 459 Mass. 745, 749 (2011). See Commonwealth v. Mattei, 455 Mass. 840, 846 n.12 (2010) (applying common-law definition of dangerous weapon to home invasion statute). Under this common-law definition, a determination whether a weapon is "dangerous" is based on a distinction between weapons that are dangerous per se and those that are dangerous as used. See Commonwealth v. Appleby, 380 Mass. 296, 303 (1980). A weapon is "dangerous per se" if it is an "instrumentality designed and constructed to produce death or great bodily harm" and "for the purpose of bodily assault or

defense." Weapons of this type include "firearms, daggers, stilettos and brass knuckles" but not "pocket knives, razors, hammers, wrenches and cutting tools" [quotations and citations omitted]. Id.

On the record here, the evidence was insufficient for a determination that the defendant's knife was dangerous per se. The knife that the defendant had in his possession when he was arrested was a three and one-half inch "folding" knife that was on his person, but was not in his hand, when he was apprehended. See id. ("pocket knives" are not dangerous per se). Such a determination cannot be made absent "information regarding the design, purpose, and construction of the knife." See Commonwealth v. Wynton W., 459 Mass. at 755. The judge noted in her decision on the defendant's motion for a new trial that the requisite determination could not be made on this record. Thus, the jury should have been instructed not that the knife was inherently dangerous, but that they must determine whether it was dangerous as used.[17] See Commonwealth v. Delaney, 442 Mass. 604, 615 (2004) (because "[a] pocket knife of the type the defendant described is not a dangerous weapon per se, as it is not 'designed for the purpose of bodily assault or defense'"

---

[17] The judge, however, declined to disturb the home invasion conviction, concluding that there was sufficient evidence that the knife was dangerous as used, such that a correct instruction would not have led to a different result.

[citation omitted], judge should have instructed jury to determine whether knife was dangerous as used and not that it was dangerous per se); Commonwealth v. Appleby, 380 Mass. at 303 (pocket knives not classified as dangerous per se).

Such an instruction, however, would not have obviated the need to vacate the defendant's conviction of this charge, as the evidence was also insufficient to support a finding that the defendant's knife, which he had in his possession when he entered his grandmother's house, was dangerous as used. The evidence suggests only that the defendant used the knife to gain entry to the house; there is no indication that he used it thereafter. There was no evidence or argument that the victim was stabbed, or that any item inside the house was cut or slashed. In addition, while displaying the knife in a threatening manner might have rendered it dangerous as used, the Commonwealth adduced no evidence that such a display occurred.[18] See Commonwealth v. Mattei, 455 Mass at 846 n.12 (whether weapon is dangerous as used in home invasion depends on its "apparent ability to inflict harm" and "whether the victim reasonably so perceived it" [citation omitted]). Accordingly, the defendant's conviction of armed home invasion must be vacated and set aside,

_____

[18] The argument that the defendant may have used the knife to threaten the victim is speculative and not supported by any evidence introduced at trial.

and, on remand, a directed verdict in favor of the defendant must be entered.[19]

d.  Instruction on felony-murder.  The defendant claims also that the judge's instruction on felony-murder impermissibly removed from the jury's consideration the critical factual issue whether the intent to commit the predicate felony exhibited a "conscious disregard" for human life.  "[T]he felony-murder rule is based on the theory that the intent to commit the felony is equivalent to the malice aforethought required for murder."  See Commonwealth v. Matchett, 386 Mass. 492, 507 (1982).  Accordingly, "[f]or this theory to be tenable the nature of the felony must be such that an intent to commit that crime exhibits a conscious disregard for human life" [citation omitted]  Id.

In instructing the jury on felony-murder, the judge said that the Commonwealth must prove that the defendant killed the victim in the course of committing a felony "inherently dangerous to human life."  She then instructed that, "as a matter of law, the crime of home invasion with a dangerous weapon and rape of a child by force are felonies which are inherently dangerous to human life."

_____

[19] While armed home invasion was one of the predicate felonies on which the conviction of felony-murder was based, we need not reverse the felony-murder conviction, as the jury also found that the defendant committed a second predicate felony, viz., rape of a child by force.  See note 23, infra.

Contrary to the defendant's argument, this instruction was in accordance with well-established case law. See Commonwealth v. Wadlington, 467 Mass. 192, 208 (2014) (judge did not relieve prosecution from its burden of proving "conscious disregard" element of offense of felony-murder" because "[i]t is not the province of the jury to determine whether a felony is inherently dangerous" [citation omitted]); Commonwealth v. Scott, 428 Mass. 362, 364 (1998) (whether felony is inherently dangerous is "a matter of law" to be decided by judge; where felony is inherently dangerous, "[t]here is no need to show a 'conscious disregard for human life because the risk is implicit in the intent required for the felony'" [citation omitted]). See also Commonwealth v. Matchett, 386 Mass. at 505 n.15 ("common law felonies of arson, rape, burglary, and robbery" are "inherently dangerous"). We decline the defendant's invitation to revisit this issue.

e. Closing argument. i. Whether inferences were permissible. In his closing, the prosecutor argued that the defendant was not mentally ill, and that his actions reflected calculated thinking by a "criminal mind." The prosecutor noted, in particular, that the defendant had broken into his grandmother's house with the intention of stealing her money and her vehicle, and that he had been spotted by the victim. The defendant then killed the victim to prevent her from revealing

his presence, removed her body and clothing to conceal what had happened, and went immediately to the convenience store to establish an alibi. Once he had been caught by the canine officer, the prosecutor asserted, the defendant contemplated killing the police dog with his knife and, when that effort was unsuccessful, feigned insanity. The prosecutor maintained also that the defendant's hospitalizations were the result, not of mental illness, but of "acting out" or "a substance abuse problem." The prosecutor suggested that the defendant had concocted the insanity defense because he knew that the evidence against him was strong, and that he had no other viable defense. The defendant objected to these factual assertions as lacking support in the evidence. His objections were overruled. The defendant raises the same arguments on appeal.

"A prosecutor must limit comment in closing statement to the evidence and fair inferences that can be drawn from the evidence. . . . Nonetheless, a prosecutor may argue zealously in support of inferences favorable to the Commonwealth's case that reasonably may be drawn from the evidence" [quotation and citations omitted]. Commonwealth v. Carriere, 470 Mass. 1, 22 (2014). In determining whether impermissible statements in a prosecutor's closing argument require reversal, "we consider (1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the

case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions." Commonwealth v. Kater, 432 Mass. 404, 422-23 (2000), quoting Commonwealth v. Kozec, 399 Mass. 514, 518 (1987).

Here, the challenged arguments were based largely on such reasonable inferences. The assertion that the defendant broke into his grandmother's home intending to steal her money and her vehicle is supported by evidence that the defendant entered the house by climbing on his grandmother's Explorer, and then cutting through a window screen on a second-floor window, at night and while the occupants were sleeping, and that he actually stole these items, which were found in his possession after the motor vehicle chase. See Commonwealth v. Maia, 429 Mass. 585, 587-588 (1999) ("intent to steal may be inferred where a person enters a building by force at night").

The argument that the defendant was discovered by the victim, somewhere in the house, is supported, in part, by reasonable inferences that could be drawn from the evidence. Although she slept in a room adjacent to the victim's and separated from it only by a sliding glass door, the grandmother was not aware, until hours later, that the defendant had been in the house, or that the victim was missing. Both the victim's

bedroom and the room where the grandmother was sleeping were at the back of the house, while the defendant broke in through a front window, and committed the rape in a front bedroom. Based on this, the jury reasonably might have inferred that the defendant encountered the victim not in her bedroom, but elsewhere in the house.[20]

In any event, "the line separating speculation and inference is often a fine one," and we "recognize that closing argument is identified as argument," and that the jury understand from the judge's instructions that closing arguments are not evidence. See Commonwealth v. Bresilla, 470 Mass. 422, 437-438 (2015), quoting Commonwealth v. Kozec, 399 Mass. at 516. Moreover, any impermissible inference in the prosecutor's suggestion as to the defendant's motive for the killing could not have resulted in prejudice to the defendant. The defendant's motive was a collateral issue that the Commonwealth was not required to prove. See Commonwealth v. Kozec, supra at 518 (distinguishing "collateral" errors in prosecutor's closing argument that did not go to "the heart of the case").

The jury also reasonably could have inferred that the defendant's actions after the killing were a conscious attempt to cover his tracks, demonstrating rational thought rather than

---

[20] There was also evidence, however, that bloody pillows were found in the victim's bedroom. There was no evidence whose blood it was.

insanity. That the defendant removed the victim's body and clothing from the house could be viewed as an attempt to delay discovery of the crime. Similarly, the defendant's visit to the convenience store, where he walked around but did not buy anything -- despite having just stolen cash from his grandmother -- might suggest that he went to the store for some purpose other than to shop, and that this purpose was to establish an alibi. Such an inference could have been bolstered by the defendant's question to Gandy, a few hours later, about how he might dispose of a body. The high-speed police chase and the defendant's flight on foot further support the inference, suggested by the prosecutor, that the defendant was trying at all costs to avoid capture and punishment. In addition, the jury could have inferred that, when the defendant reached for his knife after the officer turned his back, the defendant intended to attack the police dog. The evidence also supported an inference that, when the defendant realized escape was not possible, he began "ranting and raving" to establish an insanity defense. See Commonwealth v. McColl, 375 Mass. 316, 323 (1978) (prosecutor allowed to argue "that the defendant was dissembling in his claim of insanity").

Finally, based on the grandmother's testimony, the jury reasonably could have adopted the prosecutor's suggestion that the defendant's psychiatric hospitalizations were related to

substance abuse rather than another mental illness. Several witnesses testified that the defendant used marijuana or had possessed cocaine. Thus, the prosecutor's argument "seems to have been based properly on reasonable inferences that could have been drawn from the evidence." Commonwealth v. Carriere, 470 Mass. at 22.

ii. Appeals to juror sympathy. In his closing, the prosecutor asked the jury to recall that "one of the greatest fears of little kids are monsters that come out in the night." He said that, on the "night of August 4th, 2007, a monster came in the night. A monster came into the life of [the victim], and the monster looked like [the defendant]." The prosecutor repeated this comment, almost verbatim, five times. At the end of his closing, the prosecutor was crying. The defendant objected to the display of emotion, and to the refrain regarding monsters, as impermissible "appeal[s] to the sympathy of the jurors." The judge overruled the objection.

Prosecutorial "appeals to sympathy . . . obscure the clarity with which the jury would look at the evidence and encourage the jury to find guilt even if the evidence does not reach the level of proof beyond a reasonable doubt." Commonwealth v. Santiago, 425 Mass. 491, 501 (1997), S.C., 427 Mass 298 and 428 Mass. 39 (1998). Here, the prosecutor's display of emotion, and his characterization of the defendant as

a monster, were "unprofessional," "wholly inappropriate[,] and should not have occurred." Commonwealth v. Rosario, 430 Mass. 505, 515 (1999) (prosecutor "called the defendant a 'monster'"). Coming from a prosecutor who twice previously has been rebuked by this court -- and reversed -- for similar types of inappropriate argument, the remarks are particularly troubling. See Commonwealth v. Lewis, 465 Mass. 119, 128, 133 (2013) (where same prosecutor "unjustifiably demeaned the defense, the defendant, and defense counsel in his closing argument," court concluded that "prosecutor's argument was highly improper"); Commonwealth v. Williams, 450 Mass. 894, 902-907 (2008) (same prosecutor improperly vouched for witness and "improperly urged the jury to do something beyond impartial fact finding"). See also Matter of Nelson, 25 Mass. Att'y Discipline Rep. 413, 413-414 (2009) (public reprimand of prosecutor for argument in Commonwealth v. Williams, supra).[21]

That being said, whether the argument requires reversal depends not only on whether it was improper, which it plainly was, but "whether the improper statements made by the prosecutor

---

[21] We observed in Commonwealth v. Williams, 450 Mass. 894, 906 n.10 (2008), and reiterate here, that the prosecutor was "an experienced member of the district attorney's staff. To say that he knew or certainly should have known better than to offer the wholly improper argument is a gross understatement." Here, the "judge should have interrupted the prosecutor when he began" making such inappropriate remarks, and should have provided a "curative instruction." See id.

'constituted prejudicial error.'" See Commonwealth v. Santiago, 425 Mass. at 500, quoting Commonwealth v. Daggett, 416 Mass. 347, 352 n.5 (1993). As the defendant notes, a timely objection was lodged, and the argument "went to the heart of the case." See Commonwealth v. Kater, 432 Mass. at 422. The assertion that the defendant was a "monster" was, in context, an attempt to convince the jury that the defendant was not mentally ill but, rather, a calculating killer. Nevertheless, we are persuaded that reversal is not required in the circumstances here.

First, the judge instructed the jury, both before and after the closing arguments, that such arguments "are not evidence." She also gave the standard instruction that the jury should "not be swayed by prejudice, by bias, by sympathy or anger," and should not "be influenced by any personal likes or dislikes that [they] have come to feel toward any party." See id. (we examine "what specific or general instructions the judge gave the jury which may have mitigated the mistake"). See also Commonwealth v. Camacho, 472 Mass. 587, 609 (2015) ("Although none of the errors was addressed specifically, the judge instructed the jury that closing arguments are not evidence and that the jury were not to be swayed by emotion, sentiment, sympathy, or prejudice").

Second, given the gruesome nature of the crime, it is unlikely that the prosecutor's argument had an inflammatory

effect on the jury beyond that which naturally would result from the evidence presented.  See Commonwealth v. Kater, 432 Mass. at 423 ("a certain level of emotion on the part of the jurors could be expected from this type of trial").  In addition, it is clear that the jury did not blindly accept the prosecutor's arguments, as they rejected the Commonwealth's theory that the defendant had committed the killing with deliberate premeditation, acquitted him of drug possession and driving without a valid license, and convicted him of a lesser included offense on the larceny charge.  These "verdicts show that the jury were able to distinguish wheat from chaff.  We ordinarily assume that jurors are reasonably sophisticated and capable of sorting out hyperbole and speculation. . . .  The verdicts bear out this assumption."[22]  Commonwealth v. McLaughlin, 431 Mass. 506, 510-512 (2000) (reversal not required although prosecutor "erred egregiously," where defendant claimed lack of criminal responsibility, by telling jury "to ignore the question of [defendant's] mental condition").

   f.  Review under G. L. c. 278, § 33E.  We address two additional issues in conjunction with our review under G. L. c. 278, § 33E.

_____

   [22] The jury also sent a note to the judge asking whether "each charge [is] to be considered independent of other charges regarding the defendant's sanity."  This suggests that, the prosecutor's inflammatory remarks notwithstanding, the jury properly considered the defendant's insanity defense.

i.  Request for reduction of verdict to murder in the second degree.  Analogizing the facts of this case to those in Commonwealth v. Colleran, 452 Mass. 417, 422, 430-434 (2008), the defendant asks us to reduce his conviction to murder in the second degree.  In that case, we reduced the degree of guilt to murder in the second degree where, suffering from psychotic depression, the defendant strangled her child, because her "conduct, although culpable, was very much driven by her mental condition."  Id. at 434.  The evidence that the killing was "driven by [the defendant's] mental condition" in that case, however, was strong.  See id.  The defendant there presented unrebutted expert testimony that she "lacked substantial capacity to conform her conduct to the requirements of the law due to a serious mental illness."  See id. at 422.  Here, by contrast, there was no expert testimony that the defendant's actions were the product of a mental illness, and the Commonwealth's evidence that the defendant did not lack criminal responsibility was strong.

In this case, we discern no reason to exercise our power under G. L. c. 278, § 33E, to modify the jury's verdict.

ii.  Lack of statistical context for DNA evidence.  We note one other point not raised by the defendant.  The Commonwealth presented testimony from a laboratory technician that DNA samples recovered from sperm on the victim's body "matched the

DNA profile from [the defendant] and his paternal relatives." Such testimony should not have been admitted "without accompanying testimony explaining the statistical relevance of those . . . results."  See Commonwealth v. Mattei, 455 Mass. at 846.  This error did not give rise, however, to a substantial likelihood of a miscarriage of justice, as the factual proposition for which the evidence was admitted -- that the defendant raped the victim -- was undisputed.  Moreover, the technician's testimony was cumulative of other evidence that the victim was raped by the defendant.  See Commonwealth v. Linton, 456 Mass. 534, 560 (2010) ("Considering the limited probative value of the DNA evidence when considered in the context of the evidence as a whole, we are satisfied that admission of the . . . evidence without qualifying statistical measures . . . did not result in a substantial likelihood of a miscarriage of justice").

3.  Conclusion.  The conviction of home invasion is vacated and set aside, and a required finding of not guilty shall be entered on that charge.  The convictions of murder in the first degree, and of the remaining charges, are affirmed.[23]

So ordered.

---

[23] Because the defendant was convicted of murder on theories of felony-murder and extreme atrocity or cruelty, the judgment on the indictment charging aggravated rape is not duplicative. See Commonwealth v. Bizanowicz, 459 Mass. 400, 421 (2011), citing Commonwealth v. Felder, 455 Mass. 359, 370-371 (2009).