NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10046


COMMONWEALTH  vs.  JAMES M. RAKES.



Norfolk.  April 7, 2017. - September 29, 2017.

Present:  Gants, C.J., Lenk, Gaziano, Budd, & Cypher, JJ.


Homicide.  Joint Enterprise.  Grand Jury.  Evidence, Grand jury
     proceedings, Exculpatory, Prior misconduct, Joint venturer,
     Hearsay, Statement of codefendant, Criminal records, Prison
     record.  Criminal Records.  Practice, Criminal, Capital
     case, Indictment, Grand jury proceedings, Fair trial,
     Argument by prosecutor, Instructions to jury.



Indictments found and returned in the Superior Court
Department on April 1, 2002.

A motion to dismiss was heard by John C. Cratsley, J.; the
cases were tried before Judith Fabricant, J., and a motion for a
new trial, filed on November 6, 2013, was heard by her.


Alan Jay Black for the defendant.
Tracey A. Cusick, Assistant District Attorney,
for the Commonwealth.


LENK, J.  In the summer of 1987, Jay B. Schlosser and his

girl friend, Heather Buchannan, were shot and killed in the

Westwood home they shared with John D. Sweeney.  In 2005, the

defendant was convicted by a Superior Court jury as a joint venturer on two counts of murder in the first degree on the theories of felony murder, deliberate premeditation, and extreme atrocity or cruelty. His coventurer, James P. Ridge, had been tried separately at an earlier trial and had been convicted of the victims' murders.[1]

The defendant appeals from his convictions and from the subsequent denial of his motion for a new trial. He maintains that the indictments should have been dismissed because the evidence supporting them was insufficient and because the Commonwealth's presentation impaired the integrity of the grand jury by failing to disclose exculpatory evidence, introducing prior bad acts, and commenting on the defendant's invocation of his right to remain silent. As to the trial, the defendant challenges the sufficiency of the evidence and claims structural error and ineffective assistance of counsel in connection with a purported court room closure during jury selection. He also asserts error in the admission of certain hearsay evidence concerning the joint venture, in the prosecutor's closing, and in the jury instructions on reasonable doubt. He requests relief under G. L. c. 278, § 33E. We affirm the convictions and

---

[1] We affirmed James P. Ridge's convictions of two counts of murder in the first degree on all three theories, and affirmed the denial of postconviction relief. See Commonwealth v. Ridge, 455 Mass. 307 (2009).

the order denying the motion for a new trial, and, after careful review of the record, decline to set aside the verdicts or reduce the degree of guilt under G. L. c. 278, § 33E.

1. Background. We recite the facts that the jury could reasonably have found, reserving certain details for later discussion. The victims, Schlosser and Buchannan, were boy friend and girl friend. Sweeney, the intended target of the armed robbery underlying this case, had recently moved in with the victims. The victims and Sweeney, along with Ridge, the defendant's coventurer, and most of those involved in the events surrounding the killings, were all part of the same social circle, and all involved in the cocaine trade. The defendant was not a member of that social circle, although Ridge knew him, and Ridge's roommate, Kevin Trundley, knew who the defendant was.

Most of the evidence presented at trial related to Ridge. Sometime around 1986, Sweeney had convinced Ridge (a long-time friend) and members of the Ridge family to invest $10,000 to $15,000 in a business to retrieve treasure from a sunken ship in the Caribbean. The business turned out to be a scam, and Ridge and his family members lost all the money that they had invested (as did Sweeney and members of his family). Sweeney pledged to get Ridge his money back.

The promised reimbursement never materialized, other than

through Sweeney's efforts to pay Ridge back by giving him cocaine free of charge. Ridge was angry that Sweeney appeared to live in relative wealth while failing to pay Ridge the money he felt he was owed. Trundley, a friend of both Sweeney and Ridge, testified that Sweeney flaunted his wealth in Ridge's presence. Ridge was "very upset about the way [Sweeney] was living" in light of the slow repayment, and vowed to "get his money" back.

In the months leading up to the killings, Ridge became increasingly fixated on Sweeney. One witness testified that, at some point, Ridge was at Sweeney's mother's house when Sweeney was not present; he was shooting holes in Sweeney's shirts so that Sweeney would not have nice clothes to wear.

Ridge began frequently asking various acquaintances where Sweeney lived. At this time, Ridge was familiar with and had access to firearms, and he regularly traveled with a duffel bag containing "WD-40" metal lubricant, masks, and duct tape. On multiple occasions, Ridge was seen loading firearms in a peculiar manner: wearing gloves and spraying the bullets with WD-40. Ridge contended that this method would ensure that he left no traceable fingerprints. Roughly two months prior to the killings, Ridge threatened Sweeney directly, saying he would kill him if he did not receive his money.

Apparently in response to this threat, Sweeney left the

home he had previously shared with Trundley in the Jamaica Plain section of Boston.  He moved twice and ended up living in Westwood with Buchannan and Schlosser, his partners in the cocaine trade.  Ridge, for his part, took Sweeney's place as Trundley's roommate.

At some point Ridge learned, through Trundley, that Sweeney had moved in with Schlosser and Buchannan.  Approximately one week before the killings, Ridge, Trundley, and their respective girl friends drove past Sweeney's house.  Both Trundley and his girl friend testified that when passing the home, Ridge instructed the driver to slow down.  As the vehicle slowed to a "crawl," Ridge slumped down in his seat and said he did not want anyone to recognize him.  He remarked that the house would be an easy hit because of its location.  Later that week, Ridge told Trundley that he planned to rob Sweeney's house with a "brother and sister" but refused to identify them.[2]  He explained further that he planned the robbery for some time between 8 and 10 P.M. on a rainy evening, when he expected the neighbors would have their windows closed and would be watching television.

On June 25, 1987, Ridge told Trundley that the robbery would take place that night.  During the conversation, Ridge was

---

[2] The Commonwealth argued that the robbery was committed by Ridge, the defendant, and the defendant's sister, Patricia Rakes.  Patricia was scheduled to be tried jointly with the defendant, but pleaded guilty to manslaughter after the jury had been empanelled but before opening statements.

carrying the duffel bag that he regularly kept with him. Trundley agreed with Ridge to provide a key to Sweeney's house, but testified at trial that he had no such key and never followed through on his promise. In addition, as Trundley feared violence if Sweeney was in the house when the robbery occurred, he persuaded Sweeney -- without explaining why -- to leave his house and spend the evening with Trundley in Jamaica Plain. The two men were joined by three women, and together the group drank alcohol and consumed cocaine. At around 11 $\underline{P}$.$\underline{M}$., Sweeney and one of the women returned briefly to Sweeney's house with plans to pick up more cocaine.[3]

Upon arriving, Sweeney saw the bodies of Schlosser and Buchannan, bound in duct tape, on the couch. The whole house looked as if it had been ransacked. An antique rifle belonging to Schlosser lay in the kitchen, out of its normal storage place, and there was a hole in the wall that, Sweeney testified, had not been there earlier in the day. Sweeney left and immediately returned to Jamaica Plain to meet Trundley. He did not tell the woman with him what he had seen. Instead, on the drive back, he telephoned Trundley and told him that the three women would need to leave as soon as Sweeney arrived. They did so. Sweeney then frisked Trundley, suspicious he may have been

---

[3] Trundley testified that he permitted Sweeney to go back to his house at this point because he expected the robbery to have concluded.

involved in the killing.  Finding no weapons, and apparently thus satisfied, he then told him what he had seen.  Sweeney next telephoned a Federal Bureau of Investigation (FBI) agent he knew.  Early in the morning of June 26, Sweeney, Trundley, and the FBI agent met and drove together to the Westwood police station where they reported the victims' deaths.  Police tested Sweeney's hands for blood and found none.  Officers were dispatched to the house soon thereafter and found the victims' bodies as described.

The police investigation revealed that the victims died as a result of gunshot wounds.  Buchannan was shot twice, including once through the head, while Schlosser was shot once, with the single bullet passing through his wrist and then entering his skull.  As mentioned, both victims were bound with duct tape around the ankles, knees, and hands; their eyes, and Buchannan's mouth, were also covered.  Schlosser's mouth was not taped, but there appeared to be duct tape residue around it, and there was duct tape crumpled on the nearby coffee table.  Two spent .38 caliber cartridges and three shell casings were found at the scene.  There were no eyewitnesses to the killing, the murder weapon was never found, and there was no physical evidence linking either Ridge or the defendant to the killing.  Police searched, but were not able to find any usable fingerprints.  There is no indication that police tested for deoxyribonucleic

acid (DNA); that method of identification was in its infancy at the time.

Later that same day, Trundley and Sweeney drove to Cape Cod. Sweeney called Ridge and asked him to join them, and Ridge was driven down by Trundley's girl friend. On the drive, she saw Ridge with a significant amount of cocaine despite the fact that she knew him to be "broke" and unable to afford it at the time. In addition, Ridge mentioned to her that he had to see Trundley because "things didn't go right." The evening that Ridge arrived, Trundley, who had expected only a robbery, confronted him and asked, "Why did you kill those people?" Ridge replied, "because she recognized me," and warned Trundley to "keep [his] mouth shut." The next day, Sweeney and Trundley went to retrieve Sweeney's vehicle, which he had allowed Ridge to use, and found Ridge cleaning it out. Sweeney noticed a loan coupon book in the vehicle, which he was certain he had left at home on June 25. He abruptly took his vehicle back, and immediately drove away alone, leaving Ridge and Trundley behind.

Trundley testified that, after learning of Ridge's involvement with the murders, he "stayed away from him as much as [he] could," but continued to speak to him on occasion. A few weeks after their initial conversation, Ridge gave Trundley a more detailed account of the robbery and the ensuing killings. Ridge explained that when the robbers entered the home,

Schlosser grabbed an old rifle, but that "they beat him up, took the rifle away, brought him into the living room, [and] duct taped him."[4] According to Ridge, Schlosser offered to give the robbers whatever they wanted and further offered to withdraw more money for them from the bank the following day. He pleaded that "no one need[ed] to get hurt." As the robbers were about to leave, "the person that [Ridge] went in there with said he wasn't about to do any more time."[5] Ridge responded, "I got you into this, I'll get you out of this." He shot Buchannan twice and subsequently shot Schlosser once. Ridge reported that, although he stole some money and some cocaine from the home, he did not get as much as he had hoped. He left some cocaine in the home so that police would suspect that the murder was related to drug sales, and be less interested in finding the perpetrators.

Ridge again reminded Trundley to "keep [his] mouth shut." He threatened to kill him should he tell police, and pointed out that, as Trundley had aided in the preparation for the robbery, he could face charges as a joint venturer. Ridge continued to warn Trundley to stay silent over the course of the following

---

[4] At that point, Ridge still had not identified the persons who participated in the robbery with him, but acknowledged that at least one other person was involved and used the plural repeatedly.

[5] The defendant had been released on parole seventeen days prior to the killings.

year.  Trundley appears to have heeded these warnings for some time, but was cooperating with police by the summer of 1988.

Two out-of-court statements by Ridge and one by the defendant himself linked the defendant to the killings.  The first was made by Ridge to Trundley sometime in late fall of 1987, several months after the murders.  At the time, Trundley felt threatened by certain persons from whom he was attempting to collect a debt, and called Ridge for help.  Ridge told him he would "call up Rakesy and . . . come out there."  Ridge clarified that he was referring to "Jimmy Rakes" and that Rakes was "the guy I did Westwood with."

The other inculpatory statements were made much later. Ridge and the defendant were both indicted on April 1, 2002, and arraigned in Superior Court the following day.  They were thereafter held in the Dedham house of correction.  Ridge told Mark Condon, an inmate who was being transferred between units at the same institution, to "tell Rakes my end is tight."  The defendant also became friendly with Condon while incarcerated. When Condon mentioned that he knew the reason for the defendant's incarceration and had read about it in the newspaper, the defendant replied, "It was the other guy [who] shot them" while pointing toward Ridge's unit, and added that "nobody planned on getting shot."

2.  Discussion.  a.  Motion to dismiss.  Prior to trial,

the defendant moved to dismiss the indictment on several grounds, and he renews most of his contentions on appeal. Specifically, he argues that the evidence before the grand jury was insufficient to demonstrate probable cause, and that the integrity of the grand jury was impaired both by the Commonwealth's failure to present certain exculpatory evidence and by inappropriate references to his criminal history and his invocation of the right to remain silent. We discern no error warranting dismissal of the indictments or reversal of the convictions.

i. Insufficient evidence. The defendant first contends that the indictment was not supported by sufficient evidence. An appellate court reviews the sufficiency of the evidence supporting an indictment in the light most favorable to the Commonwealth. See, e.g., Commonwealth v. Levesque, 436 Mass. 443, 444 (2002). To sustain an indictment, the grand jury must be presented with "sufficient evidence to establish the identity of the accused . . . and probable cause to arrest him" for the crimes charged (citation omitted). Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982). Probable cause requires only evidence "sufficient to warrant a reasonably prudent [person] in believing that the [accused] had committed" the offense (citation omitted). Id. at 163. "This standard . . . has been employed primarily to strike down indictments in cases where a

grand jury has heard . . . no evidence whatever that would support an inference of the defendant's" guilt (citation omitted).  Commonwealth v. Truong Vo Tam, 49 Mass. App. Ct. 31, 37 (2000).

In this case, the grand jury heard sufficient evidence to warrant a finding of probable cause.  Three witnesses linked the defendant to the robbery and killing.  Sergeant Richard Nagle of the State police testified that he spoke to Michaelina Karos, the defendant's girl friend at the time of the killings, multiple times when investigating this case.  According to a conversation between Nagle and Karos in 1992, the defendant had admitted his involvement to her soon after the victims' deaths.  The defendant told Karos that he "just killed two people somewhere out in Marlborough or some fucking place," "a guy and a girl," and that the victims had been tied up with duct tape.  He explained that he killed them to avoid being identified and facing prison time for armed robbery.  Trundley testified to a conversation in which Ridge said that along with the defendant and a woman, he robbed the victims of money and cocaine, bound them with duct tape, and killed them.  Finally, Mary Bergin, a friend of the defendant, testified to a conversation with the defendant's sister Patricia.  Patricia said that she, the defendant, and Ridge "taped [the victims] up . . . and they shot them."

While the evidence before the grand jury consisted purely of hearsay, "[w]e have consistently and without notable exception held that 'an indictment may be based solely on hearsay.'" Commonwealth v. Stevenson, 474 Mass. 372, 376 (2016), quoting Commonwealth v. O'Dell, 392 Mass. 445, 450-451 (1984). Only in "extraordinary circumstances" does the exclusive reliance on hearsay so impair the grand jury proceedings as to warrant dismissal. Stevenson, supra at 377. We discern no such extraordinary circumstances in this case.

ii. Impairment of grand jury integrity through failure to present exculpatory evidence. The defendant also argues for dismissal of the indictments on the ground that the integrity of the grand jury was impaired by the Commonwealth's failure to present certain exculpatory evidence. See O'Dell, 392 Mass. at 449. Generally, "the mere withholding of exculpatory evidence [from a grand jury] is not a proper ground for the dismissal of an indictment." Commonwealth v. Pina, 406 Mass. 540, 549, cert. denied, 498 U.S. 832 (1990). There are two exceptions to this rule: if evidence was withheld in a manner that distorts the meaning of the evidence admitted, or if the exculpatory evidence was so powerful it would have severely undermined the credibility of an important witness or likely have led the grand jury not to indict. See Commonwealth v. Wilcox, 437 Mass. 33, 37 (2002); Commonwealth v. McGahee, 393 Mass. 743, 747 (1985);

O'Dell, supra at 449.

The defendant contends that two pieces of evidence could have undermined the credibility of the witnesses before the grand jury. Neither, however, was of sufficient significance to require that it be introduced. First, the defendant argues that the grand jury should have been told that Bergin admitted to being under the influence of cocaine during her conversation with Patricia Rakes. Nagle's police report indicates that Bergin told him, "I remember it was the 80's because I was doing [c]oke at the time . . . . [Patricia] came over . . . [Patricia] was nervous/paranoid looking out the window. But at the time we were all paranoid looking out the window[,] because we all did coke." This statement does not indicate that Bergin was intoxicated at the time of her conversation with Patricia. Rather, it is best read as an acknowledgment by the witness that she had used cocaine regularly in the years surrounding the victims' deaths and, as a result, feared the possibility of arrest. The admission of chronic drug use fifteen years prior to her statement would not "greatly undermine" Bergin's credibility or the Commonwealth's case. Cf. Commonwealth v. LaVelle, 414 Mass. 146, 150-151 (1993) (even prior criminal convictions of grand jury witness would not "greatly undermine" credibility).

Second, the defendant claims that the grand jury should

have been told of Federal indictments against FBI Agent John Connolly, whom Sergeant Nagle referenced.  He argues that the integrity of the proceedings were undermined by the failure to disclose indictments for Connolly's offenses, including obstruction of justice, racketeering, and conspiracy.[6]  This evidence also need not have been placed before the grand jury. Connolly was mentioned only briefly and in passing, and his credibility was not relevant to the grand jury's determination. Sergeant Nagle testified that he first heard the defendant's name when "an FBI agent named Connolly . . . called . . . and he said, 'The person you want to look at is James Rakes.'"  The subsequent investigation of the defendant, which led to the inculpatory evidence placed before the grand jury, did not involve Connolly at all.

iii.  <u>Impairment of grand jury integrity through evidence of prior bad acts and reference to invocation of right to silence</u>.  Before the grand jury, Nagle made certain references to both the defendant's unrelated bad acts and his invocation of the right to silence.  Specifically, Nagle related three statements that Karos ascribed to the defendant:  that "he kills people for money," that "his sister . . . introduced him to

---

[6] The government contended that John Connolly committed these offenses in aid of the criminal enterprise led by James "Whitey" Bulger.  See <u>United States</u> v. <u>Connolly</u>, 341 F.3d 16 (1st Cir. 2003).

Whitey Bulger when he was seventeen," and that she should always "remember the five P's when you kill someone -- proper planning prevents poor performance."  Soon thereafter, however, the prosecutor instructed the grand jurors that "you've heard some testimony . . . [that] at least some of the individuals hav[e] been involved in other crimes, and you should not use that in your consideration of whether or not they committed these particular crimes."  Nagle also commented on the defendant's invocation of his right to silence.  He told the grand jurors that he had asked the defendant about his relationship with Ridge, and the defendant replied, "This is where I stop answering questions."  He added that, when confronted with details of the murders during the interview, the defendant's "eyes began to fill up with tears" and he stared at the floor.

To warrant reversal, the defendant must show not only that the statements were inappropriate, but also that "viewed in the context of all the evidence presented to the grand jury, [the statements] 'probably made a difference,' in [the] decision to indict" (emphasis added).  Commonwealth v. Freeman, 407 Mass. 279, 283 (1990), quoting Commonwealth v. Mayfield, 398 Mass. 615, 621-622 (1986).  On this record, the defendant cannot make that showing.  The appropriately admitted evidence was more than sufficient to demonstrate probable cause.  Moreover, the prosecutor's clear and relatively contemporaneous instruction

presumably mitigated the prejudice from the introduction of prior bad acts evidence. See, e.g., Commonwealth v. Jenks, 426 Mass. 582, 587 (1998). Testimony regarding the defendant's invocation of his right to silence added little to the Commonwealth's case, as the grand jury heard stronger evidence of the defendant's consciousness of guilt in the form of his confession to Karos.

b. Sufficiency of the evidence. The defendant contends that there was insufficient evidence to convict him under any of the three theories of murder in the first degree and that his motion for a required finding should have been allowed. Because the defendant was convicted as a joint venturer, we must determine whether the evidence showed that he knowingly participated in the commission of the crime charged, alone or with others, with the intent required for the offense. See Commonwealth v. Benitez, 464 Mass. 686, 689 (2013), citing Commonwealth v. Zanetti, 454 Mass. 449, 467-468 (2009).[7]

---

[7] Both parties cite the formulation of the joint venture standard that was commonly used in jury instructions prior to our decision in Commonwealth v. Zanetti, 454 Mass. 449 (2009). This standard asks whether a defendant was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement, was willing and available to help the other if necessary" (citation omitted). Id. at 455. See, e.g., Commonwealth v. Green, 420 Mass. 771, 779 (1995). The test we apply today does not differ in substance from that one, but is simply intended to provide clearer guidance. Commonwealth v. Miranda, 474 Mass. 1008, 1008-1009 (2016).

To determine whether the Commonwealth met its burden, we apply the familiar Latimore standard:  whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See Commonwealth v. Latimore, 378 Mass. 671, 677 (1979).  A conviction may rest exclusively on circumstantial evidence, and, in evaluating that evidence, we draw all reasonable inferences in favor of the Commonwealth.  See, e.g., Commonwealth v. Lydon, 413 Mass. 309, 312 (1992), overruled on other grounds by Commonwealth v. Britt, 465 Mass. 87, 100 (2003).  A conviction may not, however, be based on conjecture or speculation.  See, e.g., Commonwealth v. Gonzalez, 475 Mass. 396, 407 (2016).  The defendant was convicted under three theories, and we consider each in turn.

i. Felony-murder.  The predicate felony alleged at trial was armed robbery.  To warrant a conviction of felony-murder as a joint venturer with armed robbery as the predicate felony, the Commonwealth had to prove that "the defendant was a joint venturer in an armed robbery and that [the victims'] death occurred 'in the commission or attempted commission of' that [armed] robbery."  Commonwealth v. Williams, 475 Mass. 705, 710 (2016), quoting G. L. c. 265, § 1.  To find the defendant guilty of the underlying felony of armed robbery, proof was required that the defendant was part of a venture in which at least one

of the coventurers was armed with a dangerous weapon, either applied violence to the victims' bodies or put them in fear, and took the victims' property with the intent to steal it. Id., and cases cited. Absent proof that the defendant himself was armed, proof that he knew his coventurer to be armed suffices to satisfy the standard. Id.

Ridge's statements indicated that a group, including at least one member who was armed, went to the house that Sweeney shared with the victims with the intent to burglarize it. The robbers bound the victims in duct tape and Ridge shot them. The perpetrators then took money and cocaine from the home. The jury could have inferred the defendant's participation in this robbery from, among other things, the fact that Ridge identified him as "the guy I did Westwood with."

The jury could further conclude that the defendant knew Ridge to be armed. A jury can infer that a defendant knew his or her coventurer to be armed in cases where the victims' resistance can reasonably be anticipated, as the defendant is presumed to recognize the need for a means by which to overcome that resistance. Commonwealth v. Netto, 438 Mass. 686, 702-703 (2003), and cases cited. In this case, the victims were to be robbed in their own home and were drug dealers. These factors were sufficient for the jury to conclude that the defendant would reasonably have expected the need to overcome resistance,

and therefore that he knew Ridge to be armed. See id. at 703 (robbery in victim's home); Williams, 475 Mass. at 711 (victim was drug dealer); Commonwealth v. Housen, 458 Mass. 702, 708 (2011) (same). Even if the defendant had been unaware that Ridge possessed a weapon in advance, it would be reasonable to conclude that he became aware over the course of the robbery and continued to participate, implicating him in the joint venture. Williams, supra at 711, citing Commonwealth v. Norris, 462 Mass. 131, 140 (2012).

ii. Deliberate premeditation. Taken in the light most favorable to the Commonwealth, the evidence was also sufficient to sustain the conviction on the theory of deliberate premeditation. Under this theory, the Commonwealth was required to prove that the defendant caused the victims' deaths, that he did so intentionally, and that he did so "after a period of reflection." See Gonzalez, 475 Mass. at 406, quoting Model Jury Instructions on Homicide 37 (2013). Because the defendant did not carry out the killings himself, the Commonwealth had to show that he participated in the killings, that he did so knowing of his coventurer's intent to kill the victims, and that he shared the necessary specific intent to kill. See Gonzalez, supra, quoting Britt, 456 Mass. at 100-101. The defendant contends that the Commonwealth failed to prove that he shared Ridge's intent to kill, or that he deliberately premeditated the

victims' deaths.

The evidence supported the inference that the defendant shared Ridge's intent to kill the victims.  See Commonwealth v. Nolin, 448 Mass. 207, 217 & n.11 (2007).  A request that a coventurer kill the victims demonstrates the specific intent to kill.  See, e.g., Commonwealth v. Cintron, 435 Mass. 509, 515-516 (2001) ("shouted [at the shooter] to kill 'that cabron'"), overruled on other grounds by Commonwealth v. Hart, 455 Mass. 230 (2009).  Here, the jury reasonably could find that the defendant's statement that he would not do "any more time" was intended to communicate that message.  It was made after the robbery had been accomplished, to a man he knew to be armed, and in the presence of the only possible witnesses, one of whom had already identified Ridge.  Cf. Norris, 462 Mass. at 139 (where defendant, in altercation with victim, stepped away and called for help from man he knew to be armed, jury could infer intent that victim be killed).

The evidence also suggested that the defendant made his decision to kill "after a period of reflection." Gonzalez, 475 Mass. at 406.  No particular length of time of reflection is required to find deliberate premeditation, and the decision may be made in only a few seconds.  See Commonwealth v. Whitaker, 460 Mass. 409, 419 (2011).  The jury can infer premeditation from the nature of the attack.  See id.  The evidence in this

case suggested that after having subdued, bound, and robbed the victims, the defendant urged his coventurer to kill them in order to avoid detection.  This demonstrated the necessary sequence of thought to support a finding of deliberate premeditation.  Cf. Norris, supra at 139.

iii.  Extreme atrocity or cruelty.  The judge also properly denied the defendant's motion for a directed verdict on the theory of extreme atrocity or cruelty.  To warrant a conviction under this theory, the Commonwealth was required to prove that the defendant knowingly participated in the killing, that he intended to cause death or grievous bodily harm or engaged in an act a reasonable person would know created a plain and strong likelihood of death, and that the killing was committed with extreme atrocity or cruelty.  See, e.g., Commonwealth v. Chhim, 447 Mass. 370, 377 (2006).  The defendant need not have intended that the killing be extremely atrocious or cruel.  See id. at 379.  For the reasons discussed, supra, the evidence established that the defendant knowingly participated in the killings with the necessary mental state.

The jury reasonably could infer that both killings were committed with extreme atrocity or cruelty.  The evidence suffices to warrant a finding of extreme atrocity or cruelty if

it establishes one or more of the so-called Cunneen factors.[8]
See, e.g., Commonwealth v. Linton, 456 Mass. 534, 546 & n.10
(2010), citing Commonwealth v. Cunneen, 389 Mass. 216, 227
(1983). In this case the evidence warranted finding at least
one such factor: a degree of consciousness and suffering on the
part of each victim. After the victims' home was broken into by
two or more people, the victims were immobilized and blinded
with duct tape, and remained in each other's presence. The
robbery continued for some time while one of the victims
attempted to bargain with the robbers. "From the evidence, the
jury reasonably could have inferred that, in those . . . minutes
before [their] death[s], the victim[s were] terrified."
Commonwealth v. Anderson, 445 Mass. 195, 202 (2005).

c. Court room closure. The defendant contended in his
motion for a new trial that the judge improperly closed the
court room to spectators during empanelment of the jury, and
that his trial counsel was ineffective for failing to object.
The motion judge, who was also the trial judge, held an
evidentiary hearing and made written findings of fact

---

[8] The factors are: (1) whether the defendant was
indifferent to or took pleasure in the victim's suffering; (2)
the consciousness and degree of suffering of the victim; (3) the
extent of the victim's injuries; (4) the number of blows
inflicted on the victim; (5) the manner and force with which the
blows were delivered; (6) the nature of the weapon used; and (7)
the disproportion between the means used to cause death and
those employed. See Commonwealth v. Cunneen, 389 Mass. 216, 227
(1983).

determining that the defendant had not met his burden to demonstrate that the court room had been closed.[9]  See Commonwealth v. Cohen (No.1), 456 Mass. 94, 107 (2010).

We accept as true the motion judge's findings of fact absent clear error.  See Commonwealth v. Greineder, 458 Mass. 207, 225 (2010), vacated on other grounds, 567 U.S. 948 (2012), S.C., 464 Mass. 580, cert. denied, 134 S. Ct. 166 (2013).  Special deference is due where, as here, the motion judge was also the trial judge.  See id.  The defendant's motion depended primarily on testimony from his wife that she saw a "do not enter" sign on the court room door and that a court officer prohibited her from entering.[10]  The judge was not required to credit the wife's testimony, and the judge articulated the specific reasons that she did not.  See Commonwealth v. DePina, 476 Mass. 614, 622 (2017).  We discern no error in the judge's findings or in her ruling that the defendant failed to meet his burden to demonstrate that the court room had been closed.  The defendant's motion for a new trial was properly denied.

d.  Admission of out-of-court statements.  Over objection,

_____

[9] The motion judge also found that the defendant had waived the substantive issue of court room closure and that any ineffective assistance was not prejudicial.

[10] The defendant's further contention that a member of his family was removed after passing a tissue to the codefendant is not borne out by the trial transcript, which indicates some discussion after the codefendant had been handed the tissue, but not that anyone was removed from the court room.

the judge admitted a series of out-of-court statements made by Ridge recounting the robbery that led to the victims' deaths and implicating the defendant.  The defendant contends that these statements constituted inadmissible hearsay.

"We recognize an exception to the hearsay rule whereby statements by joint venturers are admissible against each other if the statements are made both during the pendency of the cooperative effort and in furtherance of its goal" (quotations omitted).  Commonwealth v. Bright, 463 Mass. 421, 426 (2012), quoting Commonwealth v. Braley, 449 Mass. 316, 319 (2007).  See also Commonwealth v. Winquist, 474 Mass. 517, 520-521 (2016).  The justification for this rule is two-fold.  First, it derives from an analogy between a criminal joint venture and a lawful partnership.  Joint venturers, like business partners, are each "an agent for the other in all matters relating to the common object."  Bright, supra at 426, quoting Commonwealth v. Tivnon, 8 Gray 375, 381 (1857).  Second, the rule "is buttressed by significant policy" considerations.  Commonwealth v. White, 370 Mass. 703, 712 (1976).  During the pendency of a joint venture, the interests of the joint venturers are sufficiently aligned so as "to assure that their statements about one another will be [at least] minimally reliable."  Id.

To admit the statement of a joint venturer, the judge must make a preliminary determination, based on a preponderance of

the evidence, other than the out-of-court statement itself, that a joint venture existed between the declarant and the defendant and that the statement was made in furtherance of that venture.[11] Bright 463 Mass. at 426; Commonwealth v. Cruz, 430 Mass. 838, 844 (2000). This determination permits the statement to be placed in front of the jury, but does not suffice for the jury to consider it as bearing on the defendant's guilt. The jury must first make their own independent determination, again based on a preponderance of the evidence other than the statement itself, that a joint venture existed and that the statement was made in furtherance thereof. Bright, supra at 427, 432. We review the judge's decision to place a joint venturer's statement before the jury for abuse of discretion. See, e.g., Winquist, 474 Mass. at 521.

The defendant challenges Ridge's statements, contending that neither prerequisite was met. He argues that the independent evidence did not show the existence of a joint venture with the defendant, and that the statements were, in any event, not made in furtherance of any such venture.

i. Existence of a joint venture. As an initial matter, the judge did not abuse her discretion in finding that the

---

[11] Alternatively, the statement may be admitted provisionally, subject to a motion to strike should the evidence presented through the course of the Commonwealth's case fail to establish the existence of a joint venture. Commonwealth v. Bright, 463 Mass. 421, 426 n.9 (2012), and cases cited.

independent evidence demonstrated a joint venture between Ridge and the defendant. On appeal, we consider the evidence in the light most favorable to the Commonwealth, to determine whether the declarant and the defendant knowingly participated in the commission of a crime together with the requisite intent. See Winquist, 474 Mass. at 521, quoting Bright, 463 Mass. at 435. In this case, Condon, who had been incarcerated with the defendant, testified that when he mentioned the killings in Westwood, the defendant responded "it was the other guy [who] shot him" while pointing to Ridge's unit and added that "nobody planned on getting shot." This testimony establishes, by a preponderance of the evidence, that the defendant and Ridge were involved in a joint venture that resulted in the victims' deaths. Having so determined, we consider each of the challenged statements to determine whether they were made during, and in furtherance of, that joint venture.

ii. Specific statements. The defendant objects to the admission of a statement from Ridge to Trundley from "days" before the killing. In it, Ridge purportedly revealed the details of his planned robbery, including his intention to involve a brother and sister as accomplices and to execute the robbery between 8 and 10 P.M. on a rainy night. Second, the defendant challenges testimony regarding a series of threats in which Ridge is said to have warned Trundley not to speak to

police.  The first such threat was made one week after the killings, and the last one was made approximately one year after the killings.  Third, the defendant challenges Trundley's testimony that Ridge made a statement implicating the defendant in late fall of 1987.  Trundley testified that when he called Ridge for help dealing with a threat, Ridge offered to "call up Rakesy" and clarified that "Rakesy" was "Jimmy Rakes."  When Trundley asked, "What's he gonna to do?" Ridge responded, "He's the guy I did Westwood with."  Finally, the defendant challenges the admission of Ridge's statement to Condon when Condon was an inmate with both Ridge and the defendant.  In that statement, made nearly fifteen years after the killings, Ridge asked Condon to "tell Rakes that my end is tight."

A.  <u>Statements from Ridge to Trundley</u>.  I.  <u>Statement before the killing</u>.  The defendant challenges the admission of statements from Ridge to Trundley, made a few days before the killing, arguing that they predate any joint venture.  We reject this contention, as "[m]atters surrounding the history of the conspiracy, including statements of coconspirators, may be admissible even if they predate the conspiracy."  <u>Commonwealth</u> v. <u>McLaughlin</u>, 431 Mass. 241, 248 (2000), citing <u>Commonwealth</u> v. <u>Rankins</u>, 429 Mass. 470, 473 (1999).  The Commonwealth is entitled to "show the whole history of the conspiracy" beginning with "preparations made by [the principal]" (citation omitted).

Commonwealth v. Borans, 379 Mass. 117, 147 (1979). Therefore, statements probative of the declarant's intent to enter into a joint venture with the defendant to commit a crime may be admitted under the joint venture exception.[12] McLaughlin, supra at 248. See also Rankins, supra at 474 (statement two years prior to killings in which declarant expressed "disdain for her husband" [the victim] admissible in prosecution of coventurer as "relevant to whether there was a later conspiracy"). Here, as in Rankins, even if the joint venture had not yet begun, Ridge's statement that he expected to be accompanied by a brother and sister was relevant to proving the existence of a joint venture in the near future.

II. Warnings to stay silent. We turn next to the series of threats Ridge made to Trundley in an attempt to ensure his silence. These threats were communicated at various times over the year following the murders. The defendant contends that any joint venture had concluded before these statements were made, and therefore they cannot have been made in furtherance of the joint venture.

----

[12] Ridge's statement also was admissible as a statement of the declarant's intent. "Statements, not too remote in time, which indicate an intention to engage in particular conduct, are admissible to prove the conduct was, in fact, put in effect." Commonwealth v. Ortiz, 463 Mass. 402, 409 (2012), quoting Commonwealth v. Avila, 454 Mass. 744, 767 (2009); Mass. G. Evid. § 803(3)(B) (2017). See Commonwealth v. Fernandes, 427 Mass. 90, 95 (1998) (statement of intent one week prior to crime admissible).

"Although [the joint venture] exception to the hearsay rule 'does not apply [to statements made] after the criminal enterprise has ended . . . [it] does apply where the joint venturers are acting to conceal the crime that formed the basis of their enterprise.'" Commonwealth v. Raposa, 440 Mass. 684, 689-690 (2004), quoting Commonwealth v. Angiulo, 415 Mass. 502, 519 (1993). See Bright, 463 Mass. at 436 (statements made after fact "to encourage [a potential witness] not to disclose facts related to the murder" admissible [quotation and citation omitted]). In this case, the threats from Ridge to Trundley "were attempts 'to conceal the crime in furtherance of the joint venture,'" Bright, supra at 436, quoting Braley, 449 Mass. at 330, and therefore properly admitted.[13]

III. Statement naming and implicating the defendant. Next, we turn to Ridge's naming of the defendant as "the guy I did Westwood with." The defendant argues that this statement was not made in furtherance of any coventure. He contends that Ridge merely shared information regarding the crime with a third party. While we have expressed skepticism that disclosing the circumstances of a crime to a third party can be considered to be in furtherance of the crime disclosed, in this case Trundley

---

[13] As we pointed out in Bright, 463 Mass. at 437, absent indication that the defendant had withdrawn from the joint venture "it is of no consequence" that he was not involved in the conversations.

was, himself, a part of the joint venture. He was aware of the robbery, and helped in both the preparation for and concealment of it. Cf. Bright, 463 Mass. at 436 n.21; Commonwealth v. Colon-Cruz, 408 Mass. 533, 544 (1990).

Statements meant to ensure the silence of a coventurer, or another involved in concealing the crime, are admissible as furthering the joint venture. See Raposa, 440 Mass. at 690; Commonwealth v. Hardy, 431 Mass. 387, 393-394 (2000), S.C., 464 Mass. 660, cert. denied, 134 S. Ct. 248 (2013). To be admitted, the statement need not be necessary, or even important, to the success or concealment of the joint venture, so long as it advances the joint venture in some way. See United States v. Ford, 839 F.3d 94, 106-107 (1st Cir. 2016). Cf. United States v. Clark, 18 F.3d 1337, 1342 (6th Cir.), cert. denied, 513 U.S. 852 (1994) (statement to girl friend identifying coventurer "induced her to conceal the crimes, to allow use of her automobile to execute the robberies, and to allow use of her home to plan the robberies," thereby furthering joint venture).

In this case, Ridge's offer of help, including his identification of the defendant as a participant in the Westwood robbery and killings, advanced the coventurers' shared goal of concealing their crimes. It served to gain Trundley's loyalty, and thereby, it was hoped, his silence. Trundley already knew that Ridge and others had made their way into the victims' home

in an attempt to steal money and cocaine, and that when one of the two victims recognized Ridge, he shot and killed both.[14]  To evade detection, Ridge and his coventurers needed Trundley to remain silent.  To help ensure that silence, Ridge offered to help Trundley confront an otherwise unrelated threat to safety.

Implicating the defendant in the Westwood murders was a necessary part of the offer of assistance.  Trundley had never met and had no reason to trust the defendant.  When Ridge first offered the defendant's help, Trundley, apparently skeptical, asked, "What's he gonna do?"  By mentioning, in response, the defendant's participation in an armed robbery and murder, Ridge gave Trundley a reason to believe that the defendant was the type of person who would be useful in confronting a potentially violent situation.  Consequently, the judge did not abuse her discretion in finding the statement, in full, to be admissible.

B.  Statement from Ridge to Condon in 2002.  We turn finally to Ridge's request to Condon, made almost fifteen years after the crime, to "tell Rakes my end is tight."

To the extent the statement was hearsay,[15] it falls within

---

[14] While Trundley did not yet know the identities of the other coventurers, even his limited knowledge posed a threat to them.  Police officers would be better able to identify the coventurers if the officers knew the details of the crime and Ridge's involvement.  Therefore, all involved in the joint venture shared a common interest in his silence.

[15] The Commonwealth contends that the statement was an operative statement, not offered for the truth of the matter

the exception for statements by a joint venturer. Typically, statements deemed admissible as part of the concealment phase of a joint venture have been made relatively close in time to the commission of the crime. Winquist, 474 Mass. at 522-523. However, "the relevant consideration is not whether the statements of a joint venturer were made close in time to the commission of a crime," but rather whether the attempt to conceal was continuing. Id. at 523 (communications discussing ways to neutralize potential witnesses demonstrates ongoing effort to conceal two years after crime). Recalling the reasoning behind the joint venture exception, we look to whether the "joint venturers [continue to] share the commonality of interests which is some assurance that their statements are reliable." Id. at 522, quoting Colon-Cruz, 408 Mass. at 543.

In this case, the statement itself -- "tell Rakes my end is tight" -- demonstrates that Ridge and the defendant "remained actively engaged in an effort to conceal their . . . crimes." Winquist, 474 Mass. at 523. The statement advanced that effort by attempting to ensure that they would not testify against one another, and by "sharing information" regarding the possible testimony of others. Commonwealth v. Leach, 73 Mass. App. Ct. 758, 764 (2009) (incarcerated coventurers' discussion of need

---

asserted, and therefore not hearsay at all. No such limiting instruction was given at trial.

for silence).  See also Winquist, supra.  Moreover, the interests of the joint venturers remained fully aligned.  Both faced trials in which the strength of the Commonwealth's case would turn on the willingness of the same set of witnesses to testify, as well as the willingness of either coventurer to testify against the other.  See Colon-Cruz, 408 Mass. at 545; Leach, supra.  Contrast Commonwealth v. Santos, 463 Mass. 273, 291 (2012) (statement seeking to exculpate declarant by inculpating defendant); White, 370 Mass. at 706, 710-711 (the same).[16]

To be sure, in many cases the commonality of interests that justify the joint venture hearsay exception may dissipate over an extended period of time.  In each instance, then, the judge must make a careful and fact-intensive determination before admitting a joint venturer's out-of-court statements, and all the more so when a significant period of time had passed between the crime and the statement.  See Winquist, 474 Mass. at 523.

_____

[16] Dicta suggesting that a joint venture ends once the declarant has been arrested and incarcerated is not to the contrary.  See Commonwealth v. Santos, 463 Mass 273, 294 (2012); Commonwealth v. Angiulo, 415 Mass. 502, 519-520 (1993).  Such dicta, never the basis of any decision, is predicated on the view that after apprehension, the commonality of interests among joint venturers gives way to self-interest.  See Commonwealth v. Winquist, 87 Mass. App. Ct. 695, 703-704 (2015), S.C., 474 Mass. 517 (2016).  This view has no application where, as here, the statement itself demonstrates that the declarant and the defendant continue to cooperate to conceal the crime in preparation for trial.  See Commonwealth v. Leach, 73 Mass. App. Ct. 758, 764 (2009).

That was done here.  In light of the specifics of this case, the judge did not abuse her discretion when she determined that Ridge and the defendant were continuing to work together actively to conceal their crime when Ridge spoke to Condon in 2002.[17]

e.  Records of prior incarceration.  The Commonwealth moved to introduce certain Department of Correction (DOC) records demonstrating the defendant's prior incarceration.  He had been paroled seventeen days prior to the killings.  It was the Commonwealth's theory that after the defendant said he "wasn't about to do any more time," Ridge killed the victims so they could not testify against the defendant.  The judge, after a lengthy sidebar conference with counsel, allowed the introduction of the defendant's certificate of parole, the defendant's so called "VAX sheet," which is a computerized list that details an inmate's movement amongst various correctional institutions while in custody, and a page from the defendant's booking sheet including photographs.  The defendant concedes that some documentation of his prior incarceration could have been admitted.  He contends, however, that a single document

---

[17] The United States Supreme Court, in Grunenwald v. United States, 353 U.S. 391, 402 (1957), noted that extending the life of a joint venture could practically eliminate the statute of limitations in cases charging conspiracy.  This concern has no application in this case, as there is no statute of limitations for murder.  See Commonwealth v. Winquist, 474 Mass. 517, 525 (2016).

showing his release date would have been sufficient.

Evidence of a defendant's prior incarceration may be admitted if it is offered for a purpose other than showing the defendant's bad character or propensity to commit a crime, and if its probative value outweighs the risk of unfair prejudice. See, e.g., Commonwealth v. Crayton, 470 Mass. 228, 249 n.27 (2014); Mass. G. Evid. § 404 (b) (2017). The judge admitted the DOC records to show the defendant's identity and the motive for the killing, i.e., the defendant did not want to be sent back to prison for his participation in an armed robbery. See Commonwealth v. Brown, 462 Mass. 620, 628 (2012); Commonwealth v. Barbosa, 457 Mass. 773, 793-794 (2010), cert. denied, 563 U.S. 990 (2011). She carefully reviewed the documents proffered by the Commonwealth, and ordered significant redaction. Even if further redactions may have been desirable, we see nothing in the records admitted that warrants reversal.

The inmate history and certificate of parole were both admitted to show the defendant's release date, and therefore his motive for the killing. To the extent such duplication was unwarranted, the admission of both documents did not prejudice the defendant, as we are confident their admission "did not influence the jury, or had but very slight effect." Braley, 449 Mass. at 326, quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). Beyond the facts of the defendant's incarceration

and release, information the defendant concedes could properly have been placed before the jury, the documents mentioned the length of his sentence, the institutions in which he served that sentence, and the conditions of parole. None of this information was particularly inflammatory. Moreover, we presume the jury followed the judge's detailed limiting instruction that the evidence was not to be used to infer bad character or criminal propensity. See, e.g., Brown, 462 Mass. at 628 (2012) (discussing value of limiting instruction when evidence of prior incarceration is admitted). See also Commonwealth v. Donahue, 430 Mass. 710, 718 (2000) (limiting instruction usually renders improperly admitted evidence harmless).

The booking sheet, including photographs, was properly admitted to show that the person referenced in the other documents was the defendant. Therefore, it was appropriate for the purpose of identification. Moreover, there is little prejudicial about the booking sheet beyond the admissible fact that the defendant had previously been incarcerated. Cf. Commonwealth v. McCowen, 458 Mass. 461, 478 (2010) (evaluating prejudice stemming from prior bad acts evidence "in the context of the trial"); Commonwealth v. Bonds, 445 Mass. 821, 835 (2006) (evaluating prejudice "[i]n light of the properly admitted" evidence).

f. Prosecutor's closing argument. The defendant claims

three errors in the prosecutor's closing argument:  that he improperly appealed to jurors' emotions, that he impermissibly vouched for the credibility of a Commonwealth witness, and that he argued facts not in evidence.  We consider each in turn.

i.  Appeal to emotion.  The prosecutor in his closing argument related the last moments of one of the victims: "[Schlosser] can't see what's going on, he's got that duct tape over his face, but he knows what's coming next.  He puts his hands up in a defensive position, in desperation, maybe as he begs for his life.  In desperation he puts his hands up."  The defendant argues that this was an impermissible appeal to the jurors' emotions.

The Commonwealth charged the defendant with Schlosser's murder on a theory of extreme atrocity or cruelty.  Schlosser's emotional response was relevant, and the Commonwealth was entitled to argue it in closing.  See Commonwealth v. Barros, 425 Mass. 572, 581 (1997).  See also Commonwealth v. Murphy, 426 Mass. 395, 402 (1998) (victim's emotional suffering relevant to extreme atrocity or cruelty).  The brief reference to his mental suffering, relevant to an issue being tried, was presented in a relatively straightforward manner, and "[t]he prosecutor . . . did not . . . dwell on the potentially sympathetic material." Commonwealth v. Evans, 439 Mass. 184, 195, cert. denied, 540 U.S. 923, and cert. denied, 540 U.S. 973 (2003).  Compare Bois,

476 Mass. 15, 34 (2016) (five references to defendant as the "monster[] that come[s] out at night" and prosecutor crying by end of closing); Commonwealth v. Santiago, 425 Mass. 491, 494-495 (1997), S.C., 427 Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998) (seven references in closing to victim's pregnancy in case not charging extreme atrocity or cruelty).

ii. Vouching. Defense counsel, in his closing, frequently argued that Trundley was not to be believed because he was a "drug dealer, a liar, and a thief."[18]  The prosecutor countered by arguing:

> "Now why would Kevin Trundley make up that portion of the statement?  When Ridge finally tells Kevin Trundley who was with him, what motive does Kevin Trundley have against this man?  He knew who he was; he had seen him around South Boston before.  He had seen him around the same area as James Ridge before.  He doesn't even really know him.  Does he have any motive to come before you and implicate him, other than the truth?  That's for you to decide, ladies and gentlemen.  There is no reason why he would say 'Jimmy Rakes was the name given to me by James Ridge' if it wasn't the true."

---

[18] Defense counsel began his closing argument, a bookend to his very similar opening statement, as follows:  "A drug dealer, a liar, and a thief.  Kevin Trundley is all of those things wrapped up in one phony package, propped up on the stand to sell you a bill of goods.  He's a drug dealer, he's a liar, and he's a thief. . . .  [H]e's trying to steal [the defendant's] liberty.  He's trying to steal from you a true verdict.  He is a drug dealer, he is a liar, and he is a thief."  Much of the rest of the closing argument continued in this vein.  Counsel concluded by telling the jury "you won't follow what a drug dealer, a liar, and a thief is asking you to do.  You won't let him steal his way out of responsibility for whatever happened there, you won't let him steal a true verdict from you folks, and you won't let him steal this man's liberty."

A "prosecutor may marshal the evidence in closing argument to 'urge the jury to believe the government witnesses.'" Commonwealth v. Polk, 462 Mass. 23, 39 (2012), quoting Commonwealth v. Beaudry, 445 Mass. 577, 587 (2005). This is especially so when defense counsel has attacked the credibility of a Commonwealth witness. In such cases, the prosecutor may invite the jury to consider whether that witness had any motive to lie. See Polk, supra at 39-40; Commonwealth v. Smith, 450 Mass. 395, 408, cert. denied, 555 U.S. 893 (2008). While the prosecutor may argue on the basis of the evidence that a witness should be believed, he or she may not imply "special knowledge by which [he or she] can verify the witness's testimony." Commonwealth v. Hardy, 431 Mass. at 396-397, quoting Commonwealth v. Ciampa, 406 Mass. 257, 265 (1989). The prosecutor did not suggest personal knowledge or exceed the bounds of proper argument here; instead, he provided the jury with reasons to credit the account of a key witness. We discern no error.

iii. Facts not in evidence. Closing argument must be limited to discussion of the evidence presented and the reasonable inferences that can be drawn from that evidence. Bois, 476 Mass. at 32, quoting Commonwealth v. Carriere, 470 Mass. 1, 22 (2014). Counsel may, however, zealously argue in favor of those inferences favorable to his or her case. Bois,

supra at 32, quoting Carriere, supra.  The inferences for which counsel argues need not be necessary, or inescapable; they only need be reasonable and possible.  See, e.g., Commonwealth v. Jones, 432 Mass. 623, 628 (2000); R.W. Bishop, Prima Facia Case, § 53.134 n.5 (5th ed. 2005).

The defendant contends that several statements made by the prosecutor went beyond the evidence and the reasonable inferences.  First, the prosecutor suggested that no incriminating fingerprints or DNA were left in the house because the perpetrators of the killings wore gloves.  While this statement approached the fine line separating inference from speculation, see Commonwealth v. Kozec, 399 Mass. 514, 517 (1987), it was nonetheless sufficiently tethered to the evidence to be permissible.  There was testimony that Ridge had, on other occasions, used gloves and WD-40 to conceal his fingerprints while loading a firearm.  There also was evidence that he kept items he used for this task in a bag similar to the one with which he was seen the night of the murders.  From this, it was not "wholly implausible" to infer that Ridge used gloves for the same purpose on the evening of the killings and convinced his compatriot to do the same.[19]  Commonwealth v. Best, 23 Mass. App. Ct. 943, 944 (1986).  Cf., e.g., Bois, 476 Mass. at 32-33 (where

---

[19] There was testimony that wearing gloves would both limit the deposit of deoxyribonucleic acid (DNA) at the scene and prevent fingerprints.

person in room adjacent to victim's bedroom did not wake due to noise, permissible inference that victim encountered defendant elsewhere in home); Commonwealth v. Semedo, 456 Mass. 1, 13 (2010) (where defendant shopped at store where victim worked, permissible inference that they had interacted before).

Second, the prosecutor said that the robbers "asked [Schlosser], having ripped that [duct] tape off his mouth, 'Where's the rest of [the money and cocaine]?'" The marks on Schlosser's face, the crumpled duct tape on the coffee table next to him, and Ridge's references to speaking with Schlosser support the inference that at some point the duct tape over Schlosser's mouth had been removed to talk to him. The hypothetical dialogue presents a closer question. "[C]ounsel may present an argument by dramatizing it in imaginary dialogue," but that dialogue must remain "grounded in the evidence" [citations omitted]. Commonwealth v. Pope, 406 Mass. 581, 587 (1990). There was evidence that the robbers intended to steal money and cocaine, that they did not find as much as they had hoped, and that Schlosser pleaded with them for a chance to get more money before being killed. From this, it could fairly be inferred that Ridge demanded more money and cocaine from the victim.

In any event, even if the prosecutor's argument went too far, we are confident that it did not have an impact on the

verdict.[20]  Closing argument is argument, not evidence, and jurors are presumed to be capable of discounting excessive claims.  Kozec, 399 Mass. at 517.  Moreover, the judge in this case directly instructed the jurors not to credit statements made by counsel if such statements conflicted with the jurors' own memory of the evidence.[21]

g.  Reasonable doubt instruction.  The defendant argues that the judge's instruction on reasonable doubt diminished the Commonwealth's burden of proof.  The judge instructed the jury, "The Commonwealth is not required to prove the case to an absolute, mathematical certainty.  Mathematical certainty is that level of certainty that you have if you add two and two and arrive at four.  The Commonwealth is not required to prove its

_____

[20] The parties dispute whether the defendant's objections to the closing argument were properly preserved.  Even reviewing under the more searching standard -- prejudicial error -- we see no basis for reversal.  See, e.g., Commonwealth v. Akara, 465 Mass. 245, 263 (2013).

[21] We discern no merit in the defendant's remaining claims of improper argument.  First, the defendant contends that no evidence supported the prosecutor's claim that "more than one" person was involved in subduing the victims.  Trundley, however, testified that Ridge told him that "they" subdued the victims.  Moreover, it would be reasonable to infer that multiple people were necessary to subdue and bind two adult victims.  Second, Trundley's testimony that Ridge told him of a struggle over Schlosser's rifle was sufficient for the prosecutor to include this detail in closing argument.  Third, the prosecutor's suggestion that the victims were killed because they were witnesses to the robbery was little more than a reformulation of Ridge's statements that he killed the victims because one recognized him and that he did so to prevent the defendant from "do[ing] any more time."

case to an absolute or mathematical certainty, but it must prove each and every element of the charge beyond a reasonable doubt."[22] This instruction correctly stated the law, and

---

[22] The reasonable doubt instruction in full was: "The third important principle that applies in all criminal cases is the standard of proof beyond a reasonable doubt. I've told you -- I've told you that the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant is guilty of the charges made against him.

"So what is proof beyond a reasonable doubt? The term is often used and probably pretty well understood, but it is not easily defined. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt, for everything in the lives of human beings is open to some possible or imaginary doubt. A charge is proved beyond a reasonable doubt, if, after you have compared and considered all of the evidence, you have in your minds an abiding conviction, to a moral certainty, that the charge is true.

"I've told you that every person is presumed to be innocent unless and until he is proved guilty, and that the burden of proof is on the prosecution. If you evaluate all of the evidence and you still have a reasonable doubt remaining, the defendant is entitled to the benefit of that doubt and must be acquitted.

"It is not enough for the Commonwealth to establish a probability, even a strong probability, that the defendant is more likely to be guilty than not guilty. That is not enough. Instead, the evidence must convince you of the defendant's guilt to a reasonable and moral certainty, a certainty that convinces your understanding and satisfies your reason and judgment as jurors who are sworn to act conscientiously on the evidence. That is what we mean by proof beyond a reasonable doubt.

"The Commonwealth is not required to prove the case to an absolute, mathematical certainty. Mathematical certainty is that level of certainty that you have if you add two and two and arrive at four. The Commonwealth is not required to prove its case to an absolute or mathematical certainty, but it must prove each and every element of the charge beyond a reasonable doubt.

mirrored, nearly verbatim, instructions we have previously upheld against constitutional challenge.[23]  In several cases, we have explicitly approved of an instruction contrasting the certainty necessary for a conviction with the greater certainty of simple arithmetic.  See, e.g., Commonwealth v. O'Brian, 445 Mass. 720, 731, cert. denied, 549 U.S. 898 (2006) ("[t]he Commonwealth is not required to prove the case to a mathematical certainty.  Mathematical certainty is that level of certainty you'd have if you add ten and ten at arrive at twenty"); Commonwealth v. Mack, 423 Mass. 288, 290 n.5 (1996) ("[t]he Commonwealth is not required to prove the case to a mathematical certainty.  Mathematical certainty is that level of certainty that you will have if you add two and two and arrive at four").  There was no error in giving the same instruction in this case.

     h.  Relief pursuant to G. L. c. 278, § 33E.  We have carefully reviewed the entire record, pursuant to our duty under G. L. c. 278, § 33E.  We see no reason to set aside the verdicts or to reduce the degree of guilt.

---

     "Now that does not mean that every fact about which there is testimony in this case must be proven to that standard.  It is the elements of the crime charged that must be proven beyond a reasonable doubt, and I will tell you what those are shortly."

     [23] Approximately nine years after trial in this case, we mandated a standard reasonable doubt instruction in the exercise of our supervisory authority.  Commonwealth v. Russell, 470 Mass. 464, 477-478 (2015).  The decision in Russell was not retroactive and has no application here.  See id. at 478-479.

<u>Judgments affirmed</u>.