NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13445

COMMONWEALTH  vs.  JEAN REZAC.


Plymouth.      December 4, 2023. - July 22, 2024.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.


Reckless Endangerment of a Child.  Intimidation of Witness.
    Criminal Responsibility.  Practice, Criminal, Indictment,
    Probation.  Constitutional Law, Grand jury, Indictment,
    Privacy.  Grand Jury.  Global Positioning System Device.
    Privacy.


Indictments found and returned in the Superior Court
Department on June 27, 2018.

The cases were heard by William F. Sullivan, J.

The Supreme Judicial Court granted an application for
direct appellate review.


John P. Warren for the defendant.
Arne Hantson, Assistant District Attorney, for the
Commonwealth.
Haylie Jacobson, Committee for Public Counsel Services, for
Committee for Public Counsel Services, amicus curiae, submitted
a brief.


BUDD, C.J.  After a bench trial, a Superior Court judge

found the defendant, Jean Rezac, guilty of reckless endangerment

of a child and witness intimidation in connection with the defendant's attack on her minor son.  The defendant raises several arguments on appeal, which, for the reasons discussed infra, we reject.[1]

Background.  1.  Facts.  We recount the relevant facts as presented to the trial judge, reserving some details for later discussion.[2]  On the evening of April 24, 2018, after arguing with her then-twelve year old son (victim) about the need for him to use elastics on his dental braces, the defendant said, "What's the point of living if we are fighting all the time[?]"  The next morning, after the defendant believed that a voice told her that she should end her life, she retrieved kitchen knives and attempted to commit suicide in the bathroom but did not follow through.  She then contemplated the hopelessness of both her and the victim's lives and decided to end the victim's life to prevent him from experiencing "misery and frustration" due to his medical conditions.

---

[1] We acknowledge the amicus brief submitted by the Committee for Public Counsel Services.

[2] Although the defendant did not testify, both parties stipulated to the admission of evidence containing statements made by the defendant, including police reports and recorded interviews of both children.  The written evaluations of both expert witnesses also were submitted in evidence and contained additional statements of the defendant.

The defendant entered the victim's bedroom, asked how he was feeling, and then covered his head with a blanket and left the room. When she returned shortly thereafter, the victim felt a sharp pain in his neck, observed blood, and realized the defendant had stabbed him. The defendant then brought the victim to the bathroom, placed him in the tub and forced his head under water. The pair struggled, and the victim eventually was able to break free and ran away screaming, "[D]on't kill me, don't kill me."

The victim attempted to dial 911 on his cell phone, but the defendant took the cell phone from him before the call was answered. When the 911 dispatch operator called back, the defendant answered, said everything was "okay," and hung up. The victim eventually managed to barricade himself in another bedroom and call the police.

When police responded to the scene, they observed the victim with a cut on his neck and smeared blood on the bathroom door. The defendant, who had locked herself in the bathroom, was unresponsive. One officer forced his way into the bathroom and found the defendant sitting in a partially filled bathtub, fully clothed, with a blank stare on her face. After she attempted to stab herself with knives she had in her possession, the officer took the weapons and began to render first aid. As

he did so, the defendant stated, "I don't want to live anymore, leave me alone, just let me die."

2. <u>Procedural history</u>. The defendant was indicted on (1) assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A; (2) attempted murder, G. L. c. 265, § 16; (3) reckless endangerment of a child, G. L. c. 265, § 13L; and (4) intimidation of a witness, G. L. c. 268, § 13B. Shortly after her arraignment, the defendant moved for a criminal responsibility evaluation, which was completed by Dr. Ashley Murray while the defendant was committed at the Worcester Recovery Center and Hospital. After the defendant provided notice that she intended to raise a lack of criminal responsibility defense, the Commonwealth moved for a second evaluation, which was completed by Dr. Fabian Saleh. The defendant called both experts as witnesses at her jury-waived trial.

After the trial, the judge issued his verdict in a memorandum of decision. On the assault and battery by means of a dangerous weapon and attempted murder charges, the judge found the defendant not guilty by reason of mental illness or mental defect (major depressive disorder with depression and psychotic features). However, the judge found the defendant guilty of endangerment of a child and intimidation of a witness. The defendant was sentenced to a five-year term of probation on each

of the convictions to run concurrently.  The conditions included no unsupervised contact with her two children and global positioning system (GPS) monitoring for two years.  The defendant appealed, and this court granted the defendant's application for direct appellate review.

Discussion.  The defendant appeals from her convictions, arguing that she was not criminally responsible for any of her actions, and that, in any case, there was insufficient evidence to support the convictions.  She also argues that the indictment charging her with reckless endangerment impermissibly was ambiguous.  Finally, she challenges the probation condition of GPS monitoring as presumptively unreasonable.

1.  Criminal responsibility.  a.  Standard.  When a defendant raises a defense of a lack of criminal responsibility, the Commonwealth is required to demonstrate that the defendant was criminally responsible at the time of the offense beyond a reasonable doubt.  See Commonwealth v. Dunphe, 485 Mass. 871, 878 (2020).  The Commonwealth may do so by, among other things, establishing that the defendant did not suffer from a mental disease or defect.  See id. at 879.

If the defendant suffered from a mental disease or defect when she committed the crime, the Commonwealth must demonstrate that the defendant (1) did not lack the substantial capacity to appreciate the criminality or wrongfulness of her conduct, and

(2) did not lack the substantial capacity to conform her conduct to the requirements of the law.  See Commonwealth v. McHoul, 352 Mass. 544, 546 (1967).  See also Commonwealth v. Goudreau, 422 Mass. 731, 737 (1996) (Appendix) (providing model jury instruction on criminal responsibility).

The first prong requires proof that the defendant understood the difference between right and wrong, i.e., cognition.  See McHoul, 352 Mass. at 546.  As used in this context, "criminality" refers to the "legal import" of the conduct at issue and "wrongfulness" refers to the "moral import."[3]  Goudreau, 422 Mass. at 738 (Appendix).  That is, the Commonwealth must prove that at the time of the offense, the defendant understood either that her actions were illegal (criminal) or that they were immoral (wrongful).  See id.  The second prong requires proof that the defendant had the ability to control her actions, i.e., volition.  The Commonwealth must prove both prongs for the defendant to be held criminally responsible for her actions.  See McHoul, supra at 546-547.

The defendant contends that the judge used the wrong standard to determine that she was criminally responsible for

---

[3] Thus, we have used "wrongfulness" as shorthand for "moral wrongfulness."  See, e.g., Commonwealth v. Alemany, 488 Mass. 499, 503 (2021); Commonwealth v. Loya, 484 Mass. 98, 99 (2020); Goudreau, 422 Mass. at 738 (Appendix); McHoul, 352 Mass. at 546-547.

the actions she took after the attack on her son.  Pointing to cases from outside of this jurisdiction, the defendant argues that the standard to establish criminal responsibility is (or should be) that the Commonwealth prove the defendant was able to appreciate both the criminality and the wrongfulness of her conduct rather than one or the other.  Otherwise, she contends, a defendant could be convicted even if she believed her actions were morally, but not legally, justified or vice versa.  We are not persuaded by this argument.

To begin, we note that our standard is based on the Model Penal Code formulation, which presents the option of using either or both terms.[4]  See McHoul, 352 Mass. at 546-547 (adopting § 4.01 of Model Penal Code).  See also Model Penal Code § 4.01 & comment, at 178 nn.43-44 (Official Draft and Revised Comments 1985).  When the drafters of the Model Penal Code considered which of the two terms to use, they concluded that "few cases are likely to arise in which the variation will

---

[4] The Model Penal Code standard for criminal responsibility provides:

> "(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law."

Model Penal Code § 4.01 (Official Draft and Revised Comments 1985).

be determinative." Model Penal Code § 4.01 explanatory note, at 164. This is because "a defendant who appreciates society's moral disapproval of his conduct will almost always assume that the conduct is criminal, and vice versa." Model Penal Code § 4.01 comment 2, at 169. See Kahler v. Kansas, 589 U.S. 271, 312 (2020) (Breyer, J., dissenting) ("The two inquiries are closely related and excuse roughly the same universe of defendants"); People v. Schmidt, 216 N.Y. 324, 340 (1915) (Cardozo, J.) ("Knowledge that an act is forbidden by law will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals"). This court has used one term or the other when referencing prong one,[5] but we never have limited our inquiry to one or the other. See Goudreau, 422 Mass. at 738 (Appendix). We decline to do so today for the same reasons.

Moreover, our two-pronged legal standard imposes a higher burden of proof on the Commonwealth than jurisdictions that require proof of an appreciation of both legal and moral wrongfulness, because it includes both cognitive and volitional prongs.[6] In contrast, the jurisdictions that require the

---

[5] See, e.g., Commonwealth v. Lawson, 475 Mass. 806, 811 (2016) (criminality); Commonwealth v. DiPadova, 460 Mass. 424, 431 (2011) (wrongfulness).

[6] This court first articulated the general principles of the two-pronged approach to establishing criminal responsibility to

government to prove that a defendant understands both the legal and moral wrongfulness of her actions do not address cases where a mental disease or defect "destroys or overrides the defendant's power of self-control."[7]  Model Penal Code § 4.01 comment 2, at 167.  Our standard therefore protects the defendant who loses the ability to conform his or her actions to the requirements of the law as well as the defendant who does

---

which we adhere today in Commonwealth v. Rogers, 7 Met. 500, 501-502 (1844).  There, the court concluded that proof of criminal responsibility requires both proof of the "capacity and reason sufficient to enable [the defendant] to distinguish between right and wrong" and "mental power sufficient to apply that knowledge to his own case."  Rogers, supra.  In 1962, the American Law Institute published the first official draft of the Model Penal Code, which codified the two-prong approach this court already had embraced.  See note 4, supra.  This court officially adopted the Model Penal Code rule in McHoul, 352 Mass. at 547, noting, "we regard the Code definition as an evolutionary restatement of our [Rogers] rule rather than a substantively new rule."

[7] These jurisdictions have not adopted the Model Penal Code standard for determining criminal responsibility but instead continue to adhere to the single-prong "right-wrong" test as first articulated in M'Naghten's Case, 8 Eng. Rep. 718 (1843) (M'Naghten).  See Kahler, 589 U.S. at 319-326 (Appendix) (listing eighteen jurisdictions following M'Naghten framework, three jurisdictions following M'Naghten supplemented by volitional prong, ten jurisdictions following moral incapacity standard, fourteen jurisdictions following Model Penal Code, and two jurisdictions with "unique formulation"); 1 W.R. LaFave, Substantive Criminal Law § 7.2(a), at 717-718 (3d ed. 2018) (noting that single-prong cognitive test is "the predominant rule in the United States," used in Federal courts and "more than thirty" States).

not appreciate the criminality or wrongfulness of his or her actions.

Under our formulation of the standard, a defendant who has a mental disease or defect may be held criminally responsible for her actions only if the Commonwealth proves that she did not lack the capacity to appreciate the criminality or wrongfulness of her conduct, and she did not lack the capacity to conform her conduct to the requirements of the law.  McHoul, 352 Mass. at 546-547.  If the Commonwealth can prove one prong but not the other, the defendant may not be held criminally responsible for her conduct.  See Commonwealth v. Bois, 476 Mass. 15, 26 (2016).  We decline the defendant's invitation to change our standard for determining criminal responsibility.[8]

_____

[8] The defendant additionally argues that the Goudreau instruction is contradictory because it states that the Commonwealth must prove that a mental disease or defect "did not deprive the defendant of a meaningful understanding and intelligent comprehension of the legal and moral import of [his or her] conduct" (emphasis added).  Goudreau, 422 Mass. at 738 (Appendix).  We disagree.  This portion of the instruction focuses on the term "appreciate," emphasizing that the Commonwealth has the burden to prove that a defendant appreciated (i.e., understood) the wrongfulness of his or her actions at the time of the act.  The instruction does not require proof of both legal and moral wrongfulness.  In fact, the phrase "criminality or wrongfulness" appears in the instruction six times, all in connection with discussing the Commonwealth's burden.  See id. at 737-739 (Appendix).  This includes the sentence referenced by the defendant, which begins by reiterating that the Commonwealth must "establish that the defendant had substantial capacity to appreciate the criminality or wrongfulness of [his or her] conduct" (emphasis added).  Id. at 738 (Appendix).

b.  Application.  The defendant argues that she was not criminally responsible for her actions as the Commonwealth failed to prove that she was able to appreciate the wrongfulness of her actions after the attack.  We do not agree.

Both experts agreed that the defendant was unable to appreciate the wrongfulness of her conduct when she attacked the victim.  Specifically, both experts opined that the defendant's decision to kill her son to "prevent him further misery and frustration" demonstrated that she was unable to appreciate that her actions were "morally wrong" at the time of the attack.[9] Thus, the judge's finding that the defendant was not criminally responsible for the attack was supported by the evidence.  See Bois, 476 Mass. at 26 ("failure to prove either prong requires a verdict of not guilty by reason of insanity").

In contrast, the evidence was sufficient to find the defendant criminally responsible for her actions immediately

---

[9] The two experts disagreed regarding the second prong. Murray opined that the defendant was able to conform her conduct to the requirements of the law during and after the attack, while Saleh concluded that the defendant was unable to control her behavior during the attack because she "experienced a sudden, yet transient episode of dissociation/depersonalization, characterized by a feeling of unreality and detachment, just before and right at the time of her stabbing."  This difference of opinion is irrelevant, however, because the Commonwealth was unable to demonstrate the first prong, i.e., that the defendant appreciated the wrongfulness or criminality of her conduct when she stabbed the victim.

after the attack, i.e., when she prevented the victim from calling 911. Both experts opined that the defendant was able to appreciate the criminality of her conduct[10] based on her attempt to prevent the victim from calling the police and her attempt to kill herself to avoid being arrested.[11]

Both experts additionally indicated that, at least after the attack, the defendant had the substantial capacity to conform her conduct to the requirements of the law. Indeed, Murray opined that the defendant was "engaged in . . . purposeful behaviors" -- her wish to kill herself quickly was motivated by her not wanting to be arrested, and her stopping the attempt to drown the victim because she "couldn't overpower him and . . . [she] knew the cops were coming" indicate decision-making based on "the reality of her situation" as opposed to psychotic thought processes.

In the light most favorable to the Commonwealth, Commonwealth v. Clary, 388 Mass. 583, 588-589 (1983), this evidence was sufficient to support the trial judge's finding

---

[10] As explained supra, notwithstanding the defendant's assertions to the contrary, the Commonwealth was required to prove that the defendant lacked the capacity to understand the criminality of her actions or the wrongfulness of those actions, not both (and that the defendant could conform her actions to the requirements of the law).

[11] During the evaluation conducted by Murray, the defendant indicated that she stabbed herself because not living would be better than being "in trouble with the law."

that the defendant could appreciate the criminality of her actions and could conform her conduct to the requirements of the law after attacking the victim.  See Commonwealth v. Pugh, 462 Mass. 482, 494-495 (2012) (accepting trial judge's findings of fact except where clearly erroneous).

2.  Sufficiency of the evidence.  The defendant moved for a required finding of not guilty at the close of the Commonwealth's evidence, which was denied.  On appeal she argues that even if she were criminally responsible for her actions after the attack, there was insufficient evidence on which to convict her of reckless endangerment of a child and intimidation of a witness.  In reviewing claims of insufficient evidence, we assess the evidence in the light most favorable to the Commonwealth to determine whether any rational trier of fact could have found each element of the crime beyond a reasonable doubt.  See Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).

a.  Witness intimidation.  General Laws c. 268, § 13B, provides in relevant part:

> "Whoever willfully, either directly or indirectly:  . . . misleads, intimidates or harasses another person who is a . . . witness . . . with the intent to or with reckless disregard for the fact that it may . . . impede, obstruct, delay, prevent or otherwise interfere with . . . a criminal investigation at any stage . . . shall be punished . . . ."

See G. L. c. 268, § 13B (b) (iii), as appearing in St. 2018, c. 69, § 155.  The defendant's actions that prevented the victim, a witness to the crime, from completing his call to police to report the attack clearly fall within the behavior prohibited by the statute.  We disagree with the defendant that the Commonwealth failed to prove she acted willfully.

As mentioned supra, both experts testified that the defendant understood the criminality of her actions and was able to conform her actions to the requirements of the law when she took away her son's cell phone to prevent him from calling for help.  See Commonwealth v. Schuchardt, 408 Mass. 347, 352 (1990) ("Conduct is wilful when the actor intends both the conduct and its harmful consequences . . .").  Murray opined that this conduct demonstrated that the defendant was engaged in "purposeful" behavior.  See Commonwealth v. Brennan, 481 Mass. 146, 154 (2018) ("Wilful conduct is that which is 'intentional rather than accidental'" [citation omitted]).

b.  Reckless endangerment of a child.  To prove reckless endangerment of a child, the Commonwealth must demonstrate that the defendant wantonly or recklessly engaged in conduct that created a substantial risk of serious bodily injury or sexual abuse to a child under age eighteen, or failed to take reasonable steps to alleviate that risk where a duty to act existed.  See Commonwealth v. Hardy, 482 Mass. 416, 421 (2019).

The defendant must actually be aware of, and consciously disregard, the risk.  See G. L. c. 265, § 13L; Commonwealth v. Coggeshall, 473 Mass. 665, 670 (2016).  As defined in the statute, "serious bodily injury" is an injury that results in "permanent disfigurement, protracted loss or impairment of a bodily function, limb or organ, or substantial risk of death." G. L. c. 265, § 13L.  See Commonwealth v. Mayotte, 475 Mass. 254, 264 (2016).

Here, the judge found that after the attack in which she stabbed and attempted to drown her son, the defendant's attempts to prevent him from calling for help constituted a failure to take reasonable steps to alleviate the risk of substantial bodily injury.[12]  We are not persuaded by the defendant's arguments that there was no risk of serious bodily injury or that the defendant was not "actually aware" of the risk to the victim.  Although no medical records were submitted in evidence detailing the full extent of the victim's injuries, the statute penalizes the failure to alleviate the risk of serious bodily

---

[12] We need only examine whether the evidence was sufficient to demonstrate that the defendant failed to take steps to alleviate the risk of serious bodily harm because the judge made clear that was the theory on which the conviction was based. Contrast Commonwealth v. Gonzalez, 452 Mass. 142, 146 (2008) ("The Commonwealth concedes that because the judge's verdict did not reveal whether he relied on the theory of joint venture or constructive possession, the evidence must be sufficient to support both theories").

injury, not actual injury. See Commonwealth v. Hendricks, 452 Mass. 97, 106 (2008), S.C., 453 Mass. 1001 (2009) (sufficient evidence of reckless endangerment where defendant engaged in high-speed police chase with three year old child, who suffered no injuries). Here, the twelve year old victim had been stabbed in the neck and survived a drowning attempt at the hands of the defendant. Police observed a cut on the victim's neck and blood smeared "all over" the bathroom door, as well as blood droplets throughout the house. This evidence was sufficient to prove that the defendant failed to take reasonable steps to alleviate the risk of serious bodily harm by preventing the victim from contacting emergency aid responders after the attack. Contrast Hardy, 482 Mass. at 424-425 (insufficient evidence of reckless endangerment where evidence did "not support an inference that grave danger from not securing [the child] in a booster seat was apparent"). Although the defendant was found not criminally responsible for the conduct that created the initial harm, the evidence supported the conclusion that, after the attack, she was aware of and could appreciate the harm she caused.

3. Indictment ambiguity. The defendant argues that the reckless endangerment charge impermissibly was ambiguous because the grand jury specifically did not describe the conduct alleged to have comprised the crime. As discussed supra, reckless endangerment may be caused either by creating a substantial risk

of serious bodily injury or failing to take reasonable steps to alleviate such a risk where a duty to act exists.  See Hardy, 482 Mass. at 421.  The indictment alleges that the defendant "did engage in wanton or reckless conduct creating a substantial risk of serious bodily injury . . . or wantonly or recklessly failed to take reasonable steps to alleviate such risk or injury" (emphasis added).

Because the charge could have been based either on the attack itself or on the attempt to prevent the victim from calling the police, and the defendant was found guilty based only on her attempt to prevent the victim from contacting the police, she argues that she may have been convicted of a crime for which she was not indicted.  See Commonwealth v. Barbosa, 421 Mass. 547, 551 (1995).  We disagree.

The defendant is correct that art. 12 of the Massachusetts Declaration of Rights requires that "the offense as to which the grand jury have found probable cause, and thus have charged in an indictment, must be the same as the offense the Commonwealth seeks to prove at trial."  Commonwealth v. Sullivan, 492 Mass. 36, 42 (2023).  However, "where multiple acts are charged in an indictment as part of a single, continuing criminal episode occurring close in time," art. 12 is not violated.  Id. at 45. Thus, the question here is not whether the defendant was convicted of an offense for which she was not indicted, but

whether the Commonwealth was "within its discretion" to proceed under a single indictment for multiple theories of reckless endangerment of a child. Commonwealth v. Smiley, 431 Mass. 477, 480 (2000).

In this case, the indictment permissibly alleged a single crime perpetrated under multiple theories, which generally "may be alleged in the same count in the alternative." G. L. c. 277, § 31. See Barbosa, 421 Mass. at 550 n.5, quoting Commonwealth v. Nichypor, 419 Mass. 209, 212 (1994) ("Where a crime can be committed in any one of several ways . . . [t]hen the defendant should be convicted if it is proved that he committed the crime in any of those ways"). See also Commonwealth v. Dingle, 73 Mass. App. Ct. 274, 277-282 (2008) (statute prohibiting possession and dissemination of child pornography lawfully criminalized two means of committing same offense, despite variation in single element across two subsections).[13] The Commonwealth had the discretion to charge the defendant under a single indictment where both the defendant's attack on the

---

[13] Here, as in Dingle, the only variation between the two means of proving child endangerment are whether the defendant "engages in conduct" creating risk or "fails to take reasonable steps to alleviate" the same risk. See G. L. c. 265, § 13L. All other elements are the same, the penalty is the same, and the dual elements of proof are contained within the same provision (a single sentence), indicative of the Legislature's intent to "fashion a single crime that could be accomplished" in two ways. Dingle, 73 Mass. App. Ct. at 280-281.

victim and her attempts to block him from calling for help formed a single, continuous criminal episode. See Smiley, 431 Mass. at 479-480 ("Commonwealth was within its discretion in requesting and receiving a single indictment for armed assault in a dwelling" despite option to pursue separate indictments for each occupant of dwelling); Commonwealth v. Gunter, 427 Mass. 259, 275 n.17 (1998), S.C., 456 Mass. 1017 (2010) and 459 Mass. 480, cert. denied, 565 U.S. 868 (2011) ("It would have been possible for the Commonwealth to request that the grand jury return three separate indictments" where defendant assaulted multiple persons in dwelling as part of single attack).[14] Contrast Barbosa, 421 Mass. at 548-549 (art. 12 violated where jury considered evidence of two separate drug transactions but defendant convicted of single, unspecified transaction with "no

---

[14] Nor is the indictment ambiguous because it charged the offense in the alternative. Relying on Commonwealth v. Brogan, 415 Mass. 169 (1993), the defendant maintains that the indictment was invalid because it listed the ways of committing the offense with the disjunctive "or" rather than the conjunctive "and." Although dicta in Brogan, supra at 178, does state that an indictment properly charges commission of a crime in multiple ways "using the conjunction 'and,'" we also have stated that the disjunctive "or" is proper when alleging violation of the statute "by proof of the performance by the defendant of any one of the said acts." Commonwealth v. Martin, 304 Mass. 320, 322 (1939). This apparent contradiction easily is resolved by understanding that the use of "and" versus "or" is a matter of form, not substance. See Commonwealth v. Murphy, 415 Mass. 161, 164-165 (1993).

indication that count one of the indictment was intended to include more than one act of distribution").

The defendant does not argue that insufficient evidence was presented to the grand jury to satisfy both theories of the offense. Nor does she claim that she was not on notice of the alleged conduct underpinning each theory of reckless endangerment in this case.[15] There was no art. 12 violation.

4. GPS monitoring. As a condition of the defendant's probation, the judge ordered GPS monitoring for a period of two years. The defendant argues the failure to establish an exclusion zone renders the GPS monitoring condition presumptively unreasonable. Although judges generally have wide latitude in setting conditions of probation, Commonwealth v. Goodwin, 458 Mass. 11, 16 (2010), where a condition infringes on a constitutional right, it must be "reasonably related" to the goals of sentencing and probation to be enforceable (citation omitted), Commonwealth v. Lapointe, 435 Mass. 455, 459 (2001). Because GPS monitoring constitutes a warrantless search under art. 14 of the Massachusetts Declaration of Rights and the

---

[15] That the defendant subsequently was deemed not criminally responsible for the first set of conduct does not render the indictment invalid. See Commonwealth v. McLaughlin, 431 Mass. 506, 508 (2000) ("a defendant may be found not guilty by reason of insanity or impaired mental condition as to one charge, and guilty as to other charges, even where all arise out of the same criminal episode" [citation omitted]).

Fourth Amendment to the United States Constitution, we consider it presumptively unconstitutional unless the Commonwealth establishes that such a search is reasonable, i.e., that the government interest sufficiently outweighs the privacy intrusion.  See Commonwealth v. Roderick, 490 Mass. 669, 672-673 (2022).

In Roderick, we established that the Commonwealth has a compelling interest in enforcing exclusion zones by means of GPS monitoring as a condition of probation.  Id. at 677.  However, as the defendant points out, we also stated that this interest is furthered "only where the GPS device is configured effectively to notify authorities should a defendant enter prohibited areas."  Id.  Nevertheless, we disagree with the defendant that the GPS monitoring ordered by the judge here is impermissible because the judge did not set an exclusion zone. Here, the judge noted that GPS monitoring would further the Commonwealth's interest in enforcing the condition that the defendant stay away from the family home except for supervised visits.[16]  The absence of a geographic exclusion zone was not an

_____

[16] At the sentencing hearing, the judge said:

"I'm making a finding that the need to impose this GPS monitoring has been balanced against the privacy invasion occasioned by such monitoring.  And, the reasoning, I'd say, at this point, is that the victims in this case reside in the home[.]  [We're] not going to set a complete exclusion zone, because if there are supervised visitations

"unsubstantiated possibility," as it was in Roderick, but a deliberate choice by the judge designed to better facilitate supervised visits between the family and ensure compliance with the terms of probation.  Contrast id. at 678-679 (government interest in enforcing stay-away condition could not be justified where Commonwealth had no address for victim).

Moreover, in Roderick, we noted that even absent an exclusion zone, the Commonwealth also possesses a valid interest in deterring and investigating future crimes where they provide "sufficient evidence that a defendant poses a demonstrable risk of reoffending."  Id. at 679.  We also have previously justified GPS monitoring as a term of probation as a means to "ensure compliance with any of the defendant's . . . conditions of probation."  Commonwealth v. Johnson, 481 Mass. 710, 719-720, cert. denied, 140 S. Ct. 247 (2019).  Unlike in Roderick, where no exclusion zone existed at the inception of the search, here, the defendant's GPS monitoring was ordered at sentencing to "make sure that she's not going to the house outside of any of [the scheduled supervised visit] times."  Given the facts of this case and the government interest in "ensuring the victim's 'sense of safety, security and well-being,'" it was not unreasonable for the judge to impose the GPS monitoring to deter

that occur in the house, [the court], certainly, would allow that."

the defendant from overstepping the limited access she had to the house and the victim.  Roderick, 490 Mass. at 677.

We conclude that the imposition of GPS monitoring in this case sufficiently balances the valid government interests against the invasion on the defendant's privacy and is reasonably related to the goals of probation.  See Johnson, 481 Mass. at 720-721 (GPS monitoring as condition of probation not unreasonable where defendant's diminished privacy expectation outweighed by governmental interests served by such monitoring).

Conclusion.  For the reasons stated, we affirm the defendant's convictions and the probation condition of GPS monitoring.

So ordered.